# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| BECKY MATHENY, individually and as Surviving Spouse of RONALD MATHENY, Deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 3:06-00565 |
| v. | ) ) | Judge Trauger |
| THE TENNESSEE VALLEY AUTHORITY, | ) ) ) | |
| Defendant/Third-Party Plaintiff/ Counter-Defendant. | ) ) ) | |
| v. | ) ) | |
| THOMAS LAWRENCE and JOHNNA LAWRENCE, | ) ) ) | |
| Defendant/Counter-Plaintiff and Counter-Plaintiff | ) ) ) | |

## MEMORANDUM

This case comes before the court on a Motion for Summary Judgment filed by the defendant (Docket No. 45), to which the plaintiff and counter-plaintiffs have responded (Docket Nos. 50; 49), and the defendant has replied (Docket No. 53). For the reasons discussed herein, the defendant's motion will be denied.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Becky Matheny is the widow of Ronald Matheny, who drowned on June 10,

1

2005, when a fishing boat capsized in the Cumberland River.[1]  Mr. Matheny had been fishing

with Thomas Lawrence, his uncle, in a small boat owned by Mr. Lawrence.  The two men fished

in the boat, tied off to barges located near the skimmer wall, and then decided to travel upstream,

across the Cumberland River Channel, to fish near an island.  As the small boat moved away

from the barges and started up-river, it encountered a tug boat, The Patricia H., owned by

defendant Tennessee Valley Authority ("TVA") and operated by pilot Jeff Ralls.  Mr. Lawrence

first noticed the approaching tug boat when it was 50 yards away.  Although Pilot Ralls saw Mr.

Lawrence's fishing boat, he continued forward.  The fishing boat also crept forward slowly,

waiting for The Patricia H. to pass.  As the boats came closer to each other, Mr. Lawrence heard

the sound of the tug engine and surmised that the engine was running wide open, in a high gear.

Mr. Lawrence noticed a wake three feet high, created by the movement of the front of the tug

through the water.  Mr. Lawrence knew that his boat could not survive this wake.

 Accordingly, Mr. Lawrence attempted to turn his boat downstream, to the left, to outrun

the Patricia H., but as he turned he felt the wake already catching the back of his boat.  As the

boat continued turning, water crashed over the bow, the small fishing boat was filled with water,

and it submerged in the river.

 Mr. Matheny and Mr. Lawrence fell into the water.  Initially Mr. Matheny held onto a life

jacket, and Mr. Lawrence held onto a floating cooler.  Pilot Ralls continued to direct The Patricia

H. toward a barge, his planned destination, apparently unaware of the capsized fishing boat.  The

---

[1]Unless otherwise noted, the facts have been drawn from the plaintiff's Complaint
(Docket No. 1), the plaintiff's Response to the Defendant's Motion for Summary Judgment
(Docket No. 50), the plaintiff's Additional Statement of Material Facts (Docket No. 51), and the
plaintiff's Response to the defendant's Statement of Material Facts (Docket No. 52).

2

Patricia H.'s deckhands were in the galley, and there was no lookout.  When Pilot Ralls finally hooked onto the barge, he heard Mr. Matheny screaming.

The Patricia H. had traveled approximately 650 feet from the site of the accident. Locating the screams of the men, Pilot Ralls turned The Patricia H. back towards the spot of the capsize to attempt a rescue.  He called for two of his deckhands to come out of the galley and onto the deck to assist him.  Pilot Ralls maneuvered the tugboat approximately 8 feet from Mr. Matheny who, at that time, was still conscious and trying to stay above water.  The deckhands did not offer Mr. Matheny the 15-foot pike pole, but instead threw Mr. Matheny a life ring.  Mr. Matheny attempted to grab the life ring, putting his hand on it three times, but he did not succeed.  Mr. Matheny sunk about a foot and a half under water and stopped moving.

Mr. Matheny was now within arm's reach of the deckhands.  One of the deckhands used the pike pole to hook Mr. Matheny and pulled him into the boat.  Mr. Matheny did not regain consciousness and, despite attempts at resuscitation, he was pronounced dead upon arrival at the local hospital.  Mr. Lawrence, who remained conscious, was also pulled into the boat by the deckhands.  Mr. Lawrence was airlifted to Vanderbilt University Hospital.  He survived.

On May 31, 2006, plaintiff Becky Matheny filed this action on behalf of her deceased husband, alleging: (1) negligence against Captain Ralls, (2) negligence against TVA, (3) negligent supervision and entrustment against TVA, and (4) loss of consortium against both Captain Ralls and TVA.  (Docket No. 1)  On July 17, 2006, the plaintiff filed a notice of voluntary dismissal of the claims against Pilot Ralls without prejudice.  (Docket No. 11)  On July 26, 2007, defendant TVA filed a Third-Party Complaint against Thomas Lawrence for contribution and/or indemnification.  (Docket No. 17)  On December 15, 2006, along with Mr.

3

Lawrence's Answer, Mr. Lawrence and his wife Johnna Lawrence filed a Counterclaim against defendant TVA, alleging: (1) negligence against TVA and its employees, (2) negligent supervision and entrustment, and (3) loss of consortium. (Docket No. 26)

On June 29, 2007, defendant TVA moved for summary judgment on the negligence claims filed against it by the plaintiff and third-party counter-plaintiffs, alleging that, under the Tennessee Recreational Use Statute, Tenn. Code Ann. §§ 70-7-101 to -105 (2004), the defendant owed Mr. Matheny and Mr. Lawrence no duty to refrain from negligence.

## ANALYSIS

### I.      Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must demonstrate the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd*., 224 F.3d 797, 800 (6th Cir. 2000). Our function "is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547,

4

551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case—provided that the nonmoving party bears the burden for that element—the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To avoid summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002). And we must keep in mind that "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. Finally, "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49). With this standard in mind, the court turns to an analysis of the plaintiff's claims.

## II.    Application of the Tennessee Recreational Use Statute Under Maritime Law

Defendant TVA alleges that, under the Tennessee Recreational Use Statute, the only duty of care it owed to Mr. Matheny and Mr. Lawrence was to refrain from gross negligence or willful or malicious conduct. The Recreational Use Statute provides, in relevant part:

> The landowner, lessee, occupant, or any person in control of land or premises
> owes no duty of care to keep such land or premises safe for entry or use by others

5

for such recreational activities as hunting, fishing, trapping, camping, water sports, white water rafting, canoeing, hiking, sightseeing, animal riding, bird watching, dog training, boating, caving, fruit and vegetable picking for the participant's own use, nature and historical studies and research, rock climbing, skeet and trap shooting, skiing, off-road vehicle riding, and cutting or removing wood for the participant's own use, nor shall such landowner be required to give any warning of hazardous conditions, uses of, structures, or activities on such land or premises to any person entering on such land or premises for such purposes, except as provided . . . .

Tenn. Code Ann. § 70-7-102. As will be discussed below, there are several problems with the application of the Statute in the present case. One problem is that the negligence claims at issue do not allege that the defendant failed to keep the Cumberland River "safe for entry or use" but rather that the defendant is responsible for specific negligent actions that its agents performed. In addition, as the defendant has admitted, the Cumberland River is a navigable waterway, and the TVA has not shown that it owns, leases, occupies or controls the Cumberland River, although it does use the river for its purposes, as do many other private persons.

First, however, the court must address whether the Recreational Use Statute can be applied at all, due to the jurisdictional posture of this case. The court exercises its maritime or admiralty jurisdiction in this case and, as such, federal admiralty law is to be applied. Admiralty jurisdiction is proper in this case because it involves an accident between two watercrafts on navigable waters. *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 206 (1996); *see also Sisson v. Ruby*, 497 U.S. 358, 361-67 (1990); *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 677 (1982). With admiralty jurisdiction "comes the application of substantive admiralty law." *Yamaha Motor Corp.*, 516 U.S. at 199 (quoting *East River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 846 (1986); *National Enters., Inc. v. Smith*, 114 F.3d 561, 565 (6th Cir. 1997) ("When a district court exercises its admiralty jurisdiction, that court must apply admiralty law,

6

rather than state law, to the case before it.")

This court's exercise of admiralty jurisdiction "does not result in automatic displacement of state law." *Id*. (quoting *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co*., 513 U.S. 527, 545 (1995). However, admiralty law does require displacement of state law in a great many contexts. *See, e.g., Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 398-99 (1970) (holding that wrongful death actions asserted under admiralty jurisdiction lie under "general maritime law for death caused by violation of maritime duties" and are not limited to standards of liability created by state law); *Harris v. United States*, 261 F.3d 643, 647 (6th Cir. 2001) ("[G]eneral admiralty law, not state law, governs claims resulting from maritime deaths in territorial waters."); *TAG/ICIB Services v. Pan American Grain Co.*, 215 F.3d 172, 177 (1st Cir. 2000) ("[A]n admiralty court must apply the federal maritime rules that directly address the issues at hand, and only resort to state law when no federal rule applies.").

Under the Supreme Court's most recent line of cases, state law is to be applied where it "fills gaps" or provides relief that otherwise would not be available under admiralty law; but, where state law would supersede or limit clearly defined maritime causes of action, it cannot be applied. For instance, in *Yamaha Motor Corp.*, 516 U.S. at 204-05 (1996), the Supreme Court addressed whether state remedies for recovery that included damages for the loss of society of a deceased minor child and damages for the loss of that child's future earnings could be applied in a maritime case, when federal remedies did not typically include those damages. The Court in *Yamaha* cited a long-standing tradition of recognizing state causes of action for wrongful death in admiralty jurisdiction where the plaintiffs in such cases would otherwise have been without recovery. *Id*. at 207 (citing *The Hamilton*, 207 U.S. 398 (1907); *Western Fuel Co. v. Garcia*,

257 U.S. 233 (1921)). Next the Court analyzed the *Moragne* decision, 398 U.S. at 398-99, in which the Court had held that state law could not be applied to limit the relief for the federal maritime wrongful death cause of action. *Id*. at 209-214. The Court held that *Moragne* had not launched a solitary federal scheme and, instead, that variations in state law could continue to proliferate in admiralty cases so long as those variations broadened the possibility or the extent of relief, reasoning that "*Moragne*, in sum, centered on the extension of relief, not on the contraction of remedies." *Id*. at 213.

The Court in *Yamaha* adopted the Third Circuit's reasoning that, "to read into *Moragne* the idea that it was placing a ceiling on recovery for wrongful death, rather than a floor, is somewhat ahistorical." *Id*. at 214 (quoting 40 F.3d at 641-42). Instead, the Court's self-ascribed "humane and liberal purpose" was "driven by the idea that survivors and seamen killed in state territorial waters should not have been barred from recovery simply because the tort system of the particular state in which a seaman died did not incorporate special maritime doctrines." *Id*. Further, "[i]t is difficult to see how this purpose can be taken as an intent to preclude the operation of state laws that do supply a remedy." *Id*.

On those bases, the Court held that, where Congress had not prescribed a comprehensive recovery scheme for the federal maritime tort at issue, state law could be applied to supplement the relief supplied by maritime law. *Id*. at 215. However, *Moragne*'s holding that state law could not be used to preclude recovery that would otherwise be available under maritime law retained its full force. *Id*. Under *Yamaha* and *Moragne*, federal maritime law sets a floor for recovery for wrongful death, and not a ceiling. *Id*.

In the wake of *Yamaha* and *Moragne*, the federal courts, in accordance with those

opinions, have applied state laws to admiralty cases where those state laws "fill gaps" or add additional avenues for recovery, but have not applied state laws that seek to remove proper avenues for recovery under maritime law. *See, e.g., TAG/ICIB Services*, 215 F.3d at 177; *Vanderpool v. Edmondson*, No.1:01-cv-147, 2004 WL 5210154 at *4 (E.D. Tenn. 2004) ("To the extent that Tennessee state law is in conflict with general maritime law, the conflicting state law must be disregarded."); *American Dredging Co. v. Lambert*, 81 F.3d 127, 130-31 (11th Cir. 1996) (holding that non-pecuniary damages, created under Florida law, were available in an admiralty action).

Subsequently, in *Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532 U.S. 811, 815-17 (2001), the Supreme Court addressed whether a cause of action existed, under general maritime law, for death of a non-seaman in state territorial waters resulting from negligence. Reasoning that "[w]e are able to find no rational basis . . . for distinguishing negligence from seaworthiness" the Court held that negligence is "no less a distinctively maritime duty." *Id*. at 815. Consequently, the Court held that the "tensions and discrepancies" which drove the Court in *Morgane* to supply a uniform federal cause of action for wrongful deaths resulting from seaworthiness were "no less pronounced with maritime negligence than with unseaworthiness." *Id*. Accordingly, the Court concluded that "[t]he maritime cause of action that *Moragne* established for unseaworthiness is equally available for negligence." *Id*. at 819.

Therefore, the court does not face a situation where the federal maritime law is silent as to an issue and a state statute provides an applicable rule but, rather, the court faces the situation where the federal law clearly provides a maritime avenue for recovery, under *Norfolk Shipping & Drydock*, which a state statute, if applied, would bar. That is, if the court were to apply the

Tennessee Recreational Use Statute, the plaintiff and counter-plaintiffs would be barred from pursuing federal maritime causes of action for negligence. Under the Supreme Court's regime established in *Moragne* and *Yamaha*, this is precisely the situation in which a state law should not be applied. *See also Byrd v. Byrd*, 657 F.2d 615, 617-18 (4th Cir. 1981) (holding that a state law cannot be applied "where its application would defeat an otherwise meritorious maritime cause of action"); *St. Hilaire Moye v. Henderson*, 496 F.2d 973, 980 (8th Cir. 1974) ("[S]tate law may not be applied by a federal court if it would defeat or narrow any substantial admiralty rights of recovery, either as created by federal legislation or as defined by interpretive decisions of the federal courts."); *Bagrowski v. American Export Isbrandsten Lines, Inc.* 440 F.2d 502, 506 (7th Cir. 1971) ("As a general proposition, it may be said that federal power is dominant in the maritime field and states may not deprive a party of a federally created maritime right.") Accordingly, the court finds that the Tennessee Recreational Use Statute cannot be applied in this case.

In *Harris v. United States*, 261 F.3d at 650, the Sixth Circuit declined to address whether or not the Tennessee Recreational Use Statute immunized the defendant from liability for negligence, having already held that the defendant was not negligent under the applicable standard of care and that the decedents were the proximate cause of their own deaths. However, the Sixth Circuit's willingness to address the merits of the plaintiffs' negligence claims perhaps lends credence to the court's holding today. Further, the court's holding is consistent with other language in *Harris*, rejecting the plaintiff's arguments that state law should apply "in analyzing the SIAA," and instead holding that "general admiralty law, not state law, governs claims resulting from maritime deaths in territorial waters." *Id*. at 647; *see also Brotherhood Shipping*

10

*Co., Ltd. v. St. Paul Fire & Marine Ins. Co.,* 985 F.2d 323, 325 (7th Cir. 1993) (holding that federal comparative negligence principles prevailed over state comparative negligence principles on the basis that "admiralty is not merely a basis of jurisdiction," but instead, "[i]t is a body of substantive principles as well").

The defendant seeks to apply a Tennessee law that—assuming its language applies to the facts at hand—would eliminate a cause of action that the Supreme Court has recognized as a federal avenue for recovery. The court has been directed by the Supreme Court not to apply state statutes in this very situation. Accordingly, the court finds that the Tennessee Recreational Use Statute cannot apply in this federal admiralty case.[2]

## III.    Construction of the Tennessee Recreational Use Statute

Even if the Tennessee Recreational Statute could be applied in an admiralty case, it could not be applied to the case at hand. The Recreational Use Statute does not apply to all torts alleged to have been committed on a defendant's premises but only those causes of action relying on a duty of care "to keep such land or premises safe" or those involving "warnings of hazardous conditions, uses, structures, or activities." Tenn. Code Ann. § 70-7-101. In addition, the Recreational Use Statute applies only to landowners, lessees, occupants, or any person in control of the premises in question. The defendant has not shown that it leases, occupies or

---

[2]Although this holding contradicts the Eastern District of Tennessee's unpublished order in *Peyton v. Tennessee Valley Authority,* No. 3:96-cv-0496, (E.D. Tenn. Apr. 29, 1997) which stated that, "while this is a suit in admiralty . . . the defendant's standard of care under the circumstances of this case is limited by the Tennessee recreational use act," the court notes that the Eastern District's order was published before the Supreme Court had established, in *Norfolk Shipbuilding & Drydock,* a federal cause of action for wrongful death due to negligence for non-seamen. In addition, despite the defendant's reliance on this order, the court notes that it is not bound by unpublished, two-page orders issued by another district court.

11

controls the portion of the Cumberland River where the accident in this case took place.

### A.     Application to Torts Actively Committed by the Defendant

This is not a "premises liability" or "failure to warn" case. Rather, the plaintiffs and counter-plaintiffs have alleged that the defendant's agents were negligent in the operation of a tug boat. The harms in this case are not alleged to have been caused by the defendant's failure to inspect or to repair existing conditions, or by a failure to erect warning signs, but by the operation of a vehicle in an alleged negligent fashion, and by the alleged negligent training which was thereby exhibited. The Tennessee Recreational Use Statute simply has not been applied in this context, and for good reason: the language of the Statute is limited to causes of action arising from a failure to keep the premises safe, or a failure to warn. *See* Tenn. Code Ann. § 70-7-102.

In *Wilkerson v. Altizer*, 845 S.W.2d 744, 750 (Tenn. App. 1992), the Tennessee Court of Appeals addressed whether the Recreational Use Statute applied to a cause of action for negligence arising from a boating accident on the defendant's property. In *Wilkerson*, the defendant hosted a social gathering at her step-father's farm. *Id*. at 746. During the party, one of the guests drowned when a boat in which he was sitting was intentionally capsized in a lake by several other guests. *Id*. In holding that the Recreational Use Statute did not apply to bar the plaintiffs' negligence claim, the court noted that the Statute "primarily addresses a landowner's duty to keep the land or premises safe or to warn of a danger, hazardous conditions or activities on the land." *Id*. at 750.

The defendant has attempted to distinguish *Wilkerson* on the basis that it involved social guests and did not, as the present case does, involve "sportsmen." The *Wilkerson* court did note

that the Statute "is intended to apply to sportsmen who commonly use the land of another for recreation, such as hunting and fishing." *Id.* However, the *Wilkerson* court did not base its decision on the plaintiffs' status as social guests, and for good reason: the statutory language of the Recreational Use Statute does not distinguish between guests and sportsmen, but instead applies to all persons engaged in activities on land belonging to other persons. Further, the plaintiff in *Wilkerson* was, in fact, engaged in "boating," an activity explicitly named in Tenn. Code Ann. § 70-7-102.

Instead, the *Wilkerson* court held that the Recreational Use Statute did not apply because there was nothing "in the complaint, the evidence, or argument of counsel [tending] to show that plaintiffs' complaint [was] based upon unsafe or hazardous conditions on defendants' land." *Wilkerson*, 845 S.W.2d at 750. Although the *Wilkerson* court also noted that the plaintiffs' claim was "founded upon the duty of reasonable care owed to a social guest/invitee by a social guest/landowner," *id.*, in light of the fact that the Statute does not itself distinguish between those duties, the *Wilkerson* case is best understood for its primary holding that the Statute does not apply where "[t]he condition of the premises where the accident occurred is not at issue." *Id.*

This holding is borne out by the substantial case law applying the Recreational Use Statute only in situations involving "premises liability" and "failure to warn" causes of action. *See, e.g., Spence v. Tennessee Valley Authority*, No. 3:05-0519, 2006 WL 1416759 at *4 (May 17, 2006) (holding that the Recreational Use Statute applied in a case involving "failure to warn" and "premises liability" causes of action arising from the daily operation of turbines in the Tims Ford Dam); *Sumner v. United States*, 794 F. Supp. 1358, 1366 (M.D. Tenn. 1992) (applying the Recreational Use Statute in a case where the plaintiffs encountered unexploded ammunition in

13

an impact area in Fort Campbell); *Cagle v. United States*, 937 F.2d 1073, 1075-76 (6th Cir. 1991) (applying the Recreational Use Statute to negligence claims arising from the collapse of a siege cannon located at Shiloh National Military Park).

The defendant relies on two brief unreported cases for the proposition that the Recreational Use Statute may be applied outside of the "premises liability" and "failure to warn" contexts. However, unlike the case at hand, both of those cases involved claims arising from hazardous conditions. Both cases fit within the language of the Recreational Use Statute, and they do not counsel in favor of departing from that language.

In *Sutton v. United States*, No. 5338, Op. at 2 (M.D. Tenn. May 28, 1971), the court applied a precursor of the current Recreational Use Statute to a cause of action arising from the periodic operation of hydroelectric turbines at the Center Hill Dam. *Id*. The hydroelectric turbines caused the stream bed in which the plaintiffs had been fishing to rise rapidly, causing one of the plaintiffs to drown. *Id*. Unlike the alleged negligent operation of a tugboat, the operation of the turbines in *Sutton* can be said to have been a condition of the premises, in that the operation was apparently regular enough to allow the defendant to construct warning signs and to cause a predictable effect: the rising and lowering of the water levels in the river. *Id*. Moreover, the *Sutton* decision was decided at least in part on the grounds that one of the defendants himself had been liable for the accident, for failing to take his son to a safer area after he knew or should have known that the water in the river-bed was rising. *Id*. at 4.

Similarly, in *Peyton v. Tennessee Valley Authority*, No. 3:96-0496, the court held, in a two page order, that the Recreational Use Statute applied, without analyzing any law or facts. Examination of the Complaint in that case reveals that the plaintiffs' cause of action for

14

negligence arose from the defendant's stringing of cable between two towers, across the channel. As noted above, the two-page order in *Peyton*, is not binding authority on this court. Nevertheless, the holding in *Peyton* regarding the application of the Recreational Use Statute to the facts of that case falls perfectly in line with prior cases applying that Statute in "premises liability" cases. A steel cable running across a channel can be said to be a hazardous condition on the premises. The Recreational Use Statute's stricture regarding the "duty of care to keep such land or premises safe for entry or use" can be said to apply to the facts of *Peyton*.

That statutory language cannot, however, apply to the facts in this case. As in *Wilkerson*, the plaintiff and counter-plaintiffs in this case have alleged causes of action arising from the duties of care of specific actors—in this case, agents of the defendant—undertaking specific actions, and not the duty of care to keep the premises at issue safe. In fact, the court's reasoning in *Wilkerson*, that "[t]he condition of the premises where the accident occurred is not at issue," 845 S.W.2d at 750, speaks very clearly to the facts underlying this case. Accordingly, the Tennessee Recreational Use Statute cannot apply to the plaintiff's and counter-plaintiffs' negligence claims in this case.

### B. Requirement that the Defendant Control the Premises

Finally, the Tennessee Recreational Use Statute applies only to "[t]he landowner, lessee, occupant, or any person in control of" the land or premises in question. Tenn. Code Ann. § 70-7-102. TVA faces its final insurmountable obstacles here: it has not shown that it exercises the level of control required by the Recreational Use Statute, and it is at least questionable as to whether the TVA has the congressional authority to do so.

The TVA has not shown that it owns, leases, occupies, or controls the portion of the

Cumberland River where the accident in this case took place. In support of its position that it controls the portion of the Cumberland River at issue, TVA cites the "overall plan to construct the Cumberland Plant Reservation" through which TVA acquired 275 acres of land to the right bank of Lake Barkley, in which TVA excavated a new river channel, and the fact that it has constructed "a skimmer wall, 44 mooring cells, and a coal barge-unloader" in the old river channel—that is, in the Cumberland River proper—and that it has conducted coal-barge fleeting and unloading activities in this area. (Docket No. 53 at p. 2) However, the existence of the *new* channel, and TVA's control of that channel and the land surrounding it, does not lend support to TVA's argument that it controls the *old* channel. Although TVA's construction in portions of the channel lends support to a contention that TVA *uses* the old channel, and may even be said to occupy those specific portions that it uses, it does not lend support to the contention that TVA occupies or controls the area where the accident took place.

In addition, the TVA has admitted that the area where the Lawrence boat capsized is a navigable waterway. It has long been held that "[a]ll navigable waters are under the control of the United States for the purpose of regulating and improving navigation, and although the title to the shore and submerged soil is in the various states an[d] individual owners under them, it is always subject to the servitude in respect of navigation created in favor of the Federal government by the Constitution." *Union Bridge Co. v. United States*, 204 U.S. 364, 389-90 (1907) (internal citations omitted). Further, through the "power of Congress to regulate commerce" that power is vested in the legislative branch. *Id.*

Therefore, it is not enough for TVA to show that it has condemned the land surrounding the waterway in question. As a federal corporation falling under the purview of the Executive

16

Branch, TVA is not able to arrogate control over navigable waters by its own authority. *See Gilman v. Philadelphia*, 70 U.S. 713, 724-25 (1866) ("Commerce includes navigation. The power to regulate commerce comprehends the control for that purpose, and to the extent necessary, of all the navigable waters of the United States which are accessible from a State other than those in which they lie."); *United States v. Appalachian Electric Power Co.*, 311 U.S. 377, 426-27 (1940) (holding that Congress had the authority, under the commerce clause, to require private riparian land owners to obtain a license prior to construction of dams, even where the river in question was not navigable but could potentially have been made navigable); *Owen v. United States*, 851 F.2d 1404, 1408-09 (Fed. Cir. 1988) (explaining the "navigational servitude" under which Congress maintains exclusive control over navigable waterways, even where private parties *can* be said to own title to the waterway). Therefore, in order for TVA to own, lease, occupy, or control the portion of the Cumberland River at issue, Congress would have to have granted TVA the authority to do so.

In support of such a grant, TVA cites its authority to operate "powerhouses" and "power structures" and to manage such generating plants under 16 U.S.C. § 831c(h). That section of the Tennessee Valley Authority Act provides that the TVA:

> Shall have power in the name of the United States of America to exercise the right of eminent domain, and in the purchase of any real estate or the acquisition of real estate by condemnation proceedings, the title to such real estate shall be taken in the name of the United States of America, and thereupon all such real estate shall be entrusted to the Corporation as the agent of the United States to accomplish the purposes of this chapter.

16 U.S.C. § 831c(h).

This language does not grant TVA any specific authority over navigable waters. Of course, it does not deny TVA any such authority either, and it could be argued that the grant of

17

eminent domain over "any real estate" includes the power of eminent domain over navigable waterways. However, the Supreme Court's language regarding Congressional authority over navigation and, in particular, the "navigational servitude" doctrine, counsels against a broad interpretation of 16 U.S.C. § 831c(h). As discussed above, Congress retains a "dominant right" over navigation even where private landowners can be said to own "the stream or the land underlying it." *United States v. Cherokee Nation of Oklahoma*, 480 U.S. 700, 704 (1987) (internal citations omitted); *Owen v. United States*, 851 F.2d 1404, 1408 (Fed. Cir. 1988) ("[t]he nation's navigable waterways have always been considered 'public property.'") This rule has often resulted in a "no-compensation" regime, where Congress has required private owners to undertake or refrain from undertaking some action which, otherwise, would have led to compensation under the Fifth Amendment. *Id*. It also counsels against construing the statutory authority of 16 U.S.C. § 831c(h) broadly, to arrogate a power of Congress to an agent of the Executive Branch, without any specific language indicating that it was Congress' intent to do so.

As stated above, even if it could be said that 16 U.S.C. § 831c(h) did grant TVA the authority to control navigable waterways, the record, viewed in a light most favorable to the plaintiff, indicates that TVA has not done so. Accordingly, the Tennessee Recreational Use Statute is inapplicable to the case at hand for the additional reason that TVA does not own, lease, occupy, or control the premises in question.

## CONCLUSION

For the reasons stated herein, the defendant's Motion for Summary Judgment will be

denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge