# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

BECKY MATHENY, individually and )
as Surviving Spouse of RONALD )
MATHENY, Deceased, )
                                )
      Plaintiff, )                  **Case No. 3:06-0565**
                                )                  **Judge Trauger**
v. )
                                )
THE TENNESSEE VALLEY )
AUTHORITY, )
                                )
      Defendant/Third-Party Plaintiff/ )
      Counter-Defendant. )
                                )
v. )
                                )
THOMAS LAWRENCE and JOHNNA )
LAWRENCE, )
                                )
      Third-Party Defendant/ )
      Counter-Plaintiff and )
      Counter-Plaintiff )

## MEMORANDUM

       A bench trial was held on claims for negligence, negligent supervision and entrustment, and loss of consortium arising from a boating accident that occurred on the Cumberland River. In accordance with Rule 52 of the Federal Rules of Civil Procedure, the court enters judgment for the plaintiff and for the counter-plaintiffs and sets forth herein its findings of fact and conclusions of law.

## BACKGROUND

       The plaintiff, Becky Matheny, is the widow of Ronald Matheny, who drowned on June 5,

2005, when a small boat in which he was fishing capsized in the Cumberland River.[1]  Third-party defendant and counter-plaintiff Thomas "Steve" Lawrence, Mr. Matheny's cousin, was the owner and pilot of the fishing boat in question.  The fishing boat capsized when it was swamped by the wake of a tug boat, The Patricia H., owned by defendant Tennessee Valley Authority ("TVA") and operated by pilot Jeff Ralls, a TVA employee.  Mr. Lawrence was successfully rescued by pilot Ralls and his crew.  Mr. Matheny, however, drowned before he could be rescued.

### I.    Pre-Collision Events

Mr. Lawrence and Mr. Matheny decided, on the spur of the moment, to go fishing in the Cumberland River at approximately 2:30 p.m. on June 5, 2005, a Sunday.  The two men habitually fished for catfish in the area of the Cumberland River abutting the Cumberland City Steam Plant, in Cumberland City, Tennessee, because very large catfish can be found in that area.  TVA operates the Cumberland City Steam Plant and, pursuant to its operation, floats coal barges on the banks of the river and uses tugboats to push the barges to different locations on the banks and on the island situated in the middle of the river.  In addition, a private company, Ingram Barge Co., utilizes towboat fleets to move large groups of coal barges down-river to the plant.

Mr. Lawrence and Mr. Matheny planned to fish in the Cumberland River until approximately midnight or 1:00 a.m.  They loaded two coolers into the boat—one of which contained a twelve-pack of Mountain Dew and the other, empty and intended for storing the fish

---

[1]The court relies on the facts established at the bench trial, which took place on November 6, 2007 through November 9, 2007.  Because neither party ordered an official transcript, citations to specific testimony are not included herein.

that were caught—and drove to the Cumberland Plant, which had a dock that was open to the public.  Mr. Lawrence's boat, which he had purchased used approximately one year earlier, was a 1981 Phantom.  The Phantom fishing boat was constructed of fiberglass and measured 14 feet, 10 inches in length.  The boat had a freeboard—that is, the distance from the waterline to the uppermost portion of the side of the boat, when the boat is set in water—of roughly 1 to 1.5 feet when moored.  When moving, it rode high in the water, such that it had a freeboard of 2 to 2.5 feet.  Mr. Lawrence spent a significant amount of time fishing in this boat at the Cumberland Plant and at other areas known to attract large catfish, and he had taken his children and mother out in the boat without incident.

The engine was in good working condition.  In addition, the boat contained a fully operational bilge pump and a trolling motor with a weak battery.  The trolling motor was not used on the day in question.  The boat contained no food or alcohol.  Mr. Lawrence had two good-quality life vests as well as two poor-quality ones.  The poor-quality life vests were sometimes tied to the boat to serve as bumpers.

The Cumberland Plant was roughly forty minutes away from Mr. Lawrence's home, and the two men arrived at their destination at 5:30 p.m.  When they embarked onto the river, Mr. Lawrence sat at the back of the boat near the steering wheel, and Mr. Matheny sat at the front of the boat on a seat situated on the upper deck.  This was not a pedestal seat but one that was situated flush against the deck, with Mr. Matheny's feet resting on the lower deck.  Because it was flush against the upper deck, Mr. Matheny's seat was higher than Mr. Lawrence's; however, it did not extend above the top edges of the sides of the boat.  The life vests were on the deck and in reach of the two men.

The two men fished in the lower channel between the islands and the steam plant. This channel is 400 feet wide. Conditions on the river were very mild. There was little wind and little current. The Phantom boat did not encounter any other fishing vessels, though fishing is common in the channel. Mr. Lawrence and Mr. Matheny tied off the boat to the skimmer wall, which is located close to the riverbank, just upstream from a group of six barges. The barges were 200 feet long and 35 feet wide. After a period of time, another set of eight barges were moved into place just upstream from the boat by a private tug operated by Ingram Barge Co. Mr. Lawrence alleged at trial that, at this time, he moved the boat downstream to the group of six barges, and tied the boat off to the outside of one of the barges. Subsequently, Mr. Lawrence and Mr. Matheny decided to move the boat a second time to a location nearer to the islands. Moving away from the barges, the two men saw the Patricia H. for the first time, creating a high wake.

Captain Ralls is a licensed pilot, having worked for TVA for 7 years and for Ingram Barge Co. before that. He worked the 12-hour night shift, operating the Patricia H., a highly maneuverable flat-front tugboat. The Patricia H. weighs 95 tons when loaded with fuel and gear. The boat has two engines, each with 500 horsepower. The registered dimensions of the boat are 52.5 feet x 22 feet x 8 feet. The tower of the boat is 25 to 30 feet above the deck and the deck is 7.5 feet above the water. The boat creates a wake at a 45 degree angle and also creates turbulence from the prop engines.

The Patricia H. does not contain a working RPM gauge or any other instrument that allows the pilot to determine how fast he is going. Instead, the pilot and crew estimate the speed by noting the mile markers. The terminology used by the crew for speed is "slow walk,"

"medium walk," and "fast walk." The crew—on the day in question, Craig Welker and Dwayne Van Zant—report the speed to the captain from the deck. However, the crew only stands on the deck when the boat is pushing a barge. When the boat is traveling without a barge, or "light boat," the crew remains inside the cabin, and Captain Ralls estimates the speed himself by referring to the mile markers and listening to the engines.

Captain Ralls' job is to push loaded coal barges to the unloader and then to move the empty barges back to a position adjacent to the island, from which they are eventually sent to be re-filled with coal. On June 5, 2005, Captain Ralls arrived at the plant at 7:00 p.m., spent fifteen minutes getting pre-job instruction from the coal tower foreman, then met with his crew. Soon thereafter, at roughly 7:25, Captain Ralls, Mr. Welker and Mr. Van Zant had boarded the tugboat and set upon the evening's work.

First, the Patricia H. traveled downstream to the group of six barges, next to which, against the skimmer wall, Mr. Lawrence had moored his boat. During this trip, Captain Ralls saw the fishing boat tied against the skimmer wall, between the two groups of barges. Mr. Van Zant also saw the boat in this location.

During this first trip, the Patricia H. passed the location of the fishing boat without incident. The Patricia H. pushed one of the barges—specifically, the barge on the outside corner, farthest from the fishing boat—from this group of six to the unloader, which was upstream. Captain Ralls testified that it takes approximately fifteen minutes to go and get a barge, bring it to the unloading area, and move another empty barge away from the unloader. The crew of the Patricia H. performed this function, taking an empty barge to the group of barges across the channel, next to the island, and then made a second trip to the downstream group of

5

barges, passing the fishing boat a second time. The Patricia H. was headed towards the barge on the outside, upstream corner of the group, closest to where the fishing boat had been located on the first trip.

Captain Ralls testified that, during this second trip, once again, he saw the fishing boat. Once again, the fishing boat was located in between the two groups of barges. However, the boat had untied from the wall and was moving out of this make-shift harbor, towards the open part of the channel. Captain Ralls testified that the boat turned, facing upstream, and that he watched the boat as it cleared his stern. Some time after he passed the boat, Captain Ralls heard the screams of the men in the water and, at that time, realized that the fishing boat had capsized.

## II. The Accident

Mr. Lawrence's boat capsized when it encountered the wake of the Patricia H. on the tug boat's second trip downstream. There were no other boats in the area and no other conditions existed that could have caused the fishing boat to capsize. Likewise, the evidence at trial does not support a finding that the accident was caused in any way by a defect in the fishing boat itself. Although the precise speed of the Patricia H. and the size of the wake—at best, estimated by the parties at the time of the accident—cannot be determined, it can be determined—and the court so finds—that the wake was large enough to cause Mr. Lawrence's fishing boat to capsize and to throw Mr. Lawrence and Mr. Matheny into the water.

### A. The Position of the Boats

Mr. Lawrence testified that, when he first saw the Patricia H., he was on the outside of the group of six barges, downstream from his original location against the skimmer wall. As the Patricia H. approached, he saw that it was running at a high speed and surmised, from the noise

coming from the boat, that both engines were running wide open.  He changed directions, attempting to outrun the boat by going downstream, but saw that he was hemmed in between the wake and the upstream set of barges, and so turned again—completing a 360 degree turn—to face the wake and ride over it.  He passed over the first wave, with some water entering the boat; however, by the time the second wave hit the boat, its front portion was under water.  The second wave sank the boat.  Mr. Lawrence and Mr. Matheny found themselves in the Cumberland River, screaming for help.

Captain Ralls testified that, on both trips, the fishing boat was located within the harbor created by the two sets of barges—eight barges upstream and six barges downstream—but that on the second trip it was moving out of this area, towards the path of the Patricia H., when he first saw it.  The fishing boat was 45 degrees from the shoreline, creeping forward at a very low speed.  Captain Ralls testified that, although he can stop the tug boat very fast by reversing the engines, he did not do so.  He did testify, however, that he slowed down upon encountering the fishing boat, when he was still 25 feet from the upstream edge of the downstream barges.  Captain Ralls' crew, on the other hand, testified that he slowed down only when he came to the downstream barges, approximately 600 yards past the area of the capsize.  According to Captain Ralls, the fishing boat turned upstream, traveling in the opposite direction of the tug boat.  He watched the boat clear his bow and then turned to face the approaching group of barges.  Captain Ralls did not see the boat capsize, nor did any of his crew.

From this conflicting testimony, it is far from clear exactly where the fishing boat was located when it interacted with the wake of the Patricia H.  However, in either case, it is clear that the boat was in a position such that it could not escape the effect of the wake.  In fact, the

placement of the boat in the small harbor created by the two sets of barges—in accordance with Captain Ralls' testimony—would lead great credence to Mr. Lawrence's testimony that he could not outrun the wake because there was no room between the wake and a set of barges.

In any case, Mr. Lawrence testified that he did not see the Patricia H. until its second pass towards the set of downstream barges, at which time the wake could not be avoided. No evidence contradicts that testimony. Even if the court were to find that, during both trips, the fishing boat was located between the two sets of barges, that would still comport with Mr. Lawrence's testimony that he first saw the Patricia H. only seconds before the capsize. When the Patricia H. passed for the first time, the boat was tied to the skimmer wall, and it is perfectly consistent for Mr. Lawrence not to have noticed the Patricia H. at that time.

The location of the Patricia H., too, is an important factor. On the first trip, the Patricia H. was traveling to the barge farthest downstream among the group of six barges. On the second trip, the Patricia H. was traveling to the farthest upstream barge in that group. This difference would have created a different, narrower angle of approach for the Patricia H. In short, apart from the fact that the fishing boat was moving away from the skimmer wall and towards the Patricia H. when it encountered the wake, the Patricia H. also would have been closer to the skimmer wall between the two sets of barges, due to this change in destination. Accordingly—apart from a change in speed of the tugboat—it is quite possible that the Patricia H.'s wake would not have been noticeable to Mr. Lawrence when it first passed, even if his boat traveled only a very small distance in the intervening time. Regardless of where, exactly, the fishing boat was positioned at the time of the accident, it was in a position such that the wake caused by the passing tug created a hazard that Mr. Lawrence could not overcome.

## B.    The Speed of the Tug

The court finds that the Patricia H. was capable of traveling at a high enough speed to create an unsafe wake for fishing boats and that, in this instance, it was doing so.  Mr. Lawrence estimated that the Patricia H. was traveling 20 miles per hour when he first saw it approaching him; however, the defendant's expert witness, Arthur Sargent, testified that the Patricia H. is not capable of that speed.  Nonetheless, the Patricia H. did not need to be moving at 20 miles per hour in order to be going too fast under the circumstances.

The court does not find Mr. Sargent's opinion regarding the exact speed of the Patricia H. to be very compelling.  Mr. Sargent testified that the Patricia H. could not have been going faster than 7 miles per hour because, if it were to go faster, it would create a large enough wake to splash water onto its own deck.  Mr. Sargent also testified that, at the 7 miles per hour speed, the wave created by the wake would only be .75 feet tall at a distance of 50 feet away from the boat which, according to Mr. Sargent, would not cause any danger to a small fishing boat such as Mr. Lawrence's Phantom.  Although the Patricia H.'s freeboard at its bow is not particularly high, it is considerably higher than the Phantom's freeboard, and it seems inconsistent that a wake that is almost high enough to swamp the Patricia H. itself would, simultaneously, pose no danger to a much smaller boat floating nearby.

Mr. Sargent came by his estimate of 7 miles per hour by riding in the Patricia H. with a GPS device and instructing a pilot to operate the tug until the water was just coming over the head-log of the boat.  Captain Ralls agreed that the boat could only have been traveling "a few" miles per hour at the time of the incident, although both engines were engaged at that time.  However, Captain Stoller, an expert witness for the plaintiff and a former tugboat captain, did

not agree that the speed could be determined to have been 7 miles per hour or lower, or that, at 7 miles per hour, the Patricia H. would necessarily take on excessive water. Further, the deckhands were not on board during the time in question, but were inside the cabin and therefore do not know for certain whether or not any water splashed on the deck while the Patricia H. was in progress. Although the deckhands testified that they observed no water on deck when they came out of the cabin to aid in the rescue of the two men, it can hardly be imagined that the deckhands made a thorough investigation of the deck's wetness, their attention being taxed by the sudden necessity of rescuing two men.

### C. The Size of the Wake

Although the exact size of the wake created by the Patricia H. cannot be determined, the court finds that its wake was large enough to create a hazard to the fishing boat and that the wake did, in fact, cause the fishing boat to capsize. In particular, the court finds that the defendant's contention that the wake could not have exceeded .75 feet does not comport with the evidence presented at trial.

The defendant's expert, Mr. Sargent, testified that, in accordance with tests he performed two years after the accident occurred, the wave created by the wake of the Patricia H. could not have exceeded .75 feet at a distance of 50 feet away from the tugboat. However, Mr. Sargent's finding appears not to have been based on reliable test conditions and was contradicted by the testimony of other witnesses. First, Mr. Sargent measured the height of the wave from the island in the middle of the Cumberland River *after* having measured the speed of the Patricia H. as 7 miles *on a prior trip*. That is, Mr. Sargent first found the maximum speed of the Patricia H. to be 7 miles per hour—a finding which the court does not adopt—and, second, measured the wake

of the tugboat from the shore of the island. On this second trip, Mr. Sargent kept his GPS device with him and instructed the pilot of the tugboat to go at the same speed as he had been going before. However, the pilot did not have a GPS device to tell him that he was going 7 miles per hour on this second trip. Therefore, Mr. Sargent cannot say exactly what speed the tugboat was traveling when he took that measurement.

Further, Mr. Sargent's finding is contradicted by the testimony of several fact witnesses. Mr. Van Zant, a deckhand on the Patricia H., testified at trial that, at a medium walk, the Patricia H. would create a 1.5 foot wake and, at a fast walk, the tugboat would create a 2 foot wake. At his deposition, Mr. Van Zant testified that, at a regular speed, the Patricia H. would create a wake of 1.5 to 2 feet at a distance of 50 feet from the tugboat, and that pilots sometimes go faster, creating a larger wake. At trial, Mr. Van Zant testified that sometimes the tugboat traveled at a speed fast enough that water came up to the top edge of the ratchet box, which is located on the side of the Patricia H. and sits anywhere from 2.5 to 4 feet from the surface of the water, depending on the amount of fuel the tugboat is carrying. Obviously, at this speed, the wake would exceed 2 feet. Because Mr. Van Zant has extensive experience observing the wake and speed of this particular tugboat, the court finds his testimony on this point to be particularly convincing. Although, at his deposition, Captain Ralls testified that he could not estimate the size of the wake from his vantage point in the tower of the Patricia H., at trial, he estimated the size to be one foot, from its tallest point to its lowest point. Finally, Mr. Sargent's finding is also contradicted by the testimony of Mr. Lawrence, who estimated the size of the wake to have been at least 3 feet.

In addition, Mr. Sargent testified that, although the size of the wave at a distance of 50

feet would initially have been .75 feet, it actually would have doubled to 1.5 feet after reflecting off the side of the skimmer wall. Accordingly, assuming that Mr. Sargent's findings are correct, the fishing boat would have been facing a 1.5 foot wave. If, in accordance with portions of Mr. Van Zant's testimony, the court were to find that the height of the wave was 1.5 to 2 feet high at a distance of 50 feet, then the actual size of the wave that the boat encountered would have been 3 to 4 feet.

The plaintiff's expert, Captain Stoller, testified that the speed of travel is very important in determining the estimation of wake size, and that even a slight increase or decrease in speed could significantly affect that determination. Unfortunately, Captain Ralls does not know exactly how fast he was going, and the speed of the vessel cannot be accurately reconstructed. However, what can be determined accurately is that the size of the wake was large enough to swamp Mr. Lawrence's boat. No other conditions have been identified that could have contributed to the fishing boat's capsize. The wake was large enough such that, in his position, Mr. Lawrence could not avert the accident by either outrunning the wake or turning to face it. The testimony at trial, taken as a whole, is certainly consistent with a wake size large enough to overwhelm the small fishing boat. Accordingly, the court finds that Mr. Lawrence's fishing boat was overwhelmed by the Patricia H.'s excessive wake.

## III.    Post-Collision Events

Captain Ralls had steered the Patricia H. to a resting spot perpendicular to the coal barge on the upstream corner of the group of six barges, with his cabin door open, when he first heard the men screaming. He did not hear the screams earlier, even though he had been closer to the point of the accident. This is because, in his resting spot, the cabin's open door directly faced

the location of the men.  Captain Ralls turned the tug around and summoned the deckhands via radio to come out on the deck to aid in the rescue.  Captain Ralls did not sound the man-overboard horn.  He testified that the only purpose of this horn is to signal to the deckhands that there is a man overboard and, therefore, it was unnecessary to use it, having already used the radio for this purpose.  They were 65 to 70 feet from the skimmer wall and approximately 600 yards away from the men in the water.  Captain Ralls alerted the coal tower about the accident and told them to call 911.

As the Patricia H. closed in to a distance of approximately 75 feet away from Mr. Lawrence and Mr. Matheny, the two fisherman first came into view.  When the tugboat was within 30 feet of Mr. Lawrence and Mr. Matheny, approximately 4 minutes after Captain Ralls had set course towards the two men, the deckhands began throwing life rings to them.  Rope had previously been tied to the life rings such that, if the men were to catch the rings, they could be hauled onto the boat.  However, the men were unable to grab hold of the life rings.

The Patricia H. continued to close the gap between itself and the two men.  Mr. Lawrence and Mr. Matheny were roughly 10 to 15 feet apart.  Mr. Lawrence was holding onto a large cooler.  Mr. Matheny was trying to swim, struggling to stay above water.  The deckhands continued throwing the life rings.  At first, Mr. Van Zant concentrated his efforts on rescuing Mr. Lawrence, and Mr. Welker concentrated his efforts on rescuing Mr. Matheny.  Each time the ring was tossed to Mr. Matheny, he would reach out to grab it, but the ring would slip out of his grasp.  Then he would bob down under water and back up again.  This occurred three times.  The third time that Mr. Matheny's head went under water, it stayed submerged for a slightly longer period and, when it emerged, he looked different.

At this point, Mr. Van Zant turned his attention to Mr. Matheny's rescue. Mr. Welker grabbed an eight-foot pike pole to hook Mr. Matheny and bring him to the boat. The tugboat was approximately 6 feet away from Mr. Matheny. The boat contained another pike pole which was 20 feet long, but the deckhands did not use the longer pike pole because it was difficult to maneuver. After the deckhands succeeded in pulling Mr. Matheny to the side of the boat, all three men cooperated to lift him onto the deck. Captain Ralls and Mr. Van Zant checked Mr. Matheny's pulse and then began assisted breathing. Two to three minutes passed between the time at which Mr. Welker grabbed the pike pole and when Mr. Matheny was brought onto the deck.

Meanwhile, Mr. Lawrence was still in the water, holding onto a cooler. At one point, Captain Ralls had to go back up to the tower to redirect the boat, as it was going to pass Mr. Lawrence. Mr. Welker continued to throw the life ring at Mr. Lawrence; eventually Mr. Lawrence grabbed the life ring and was hauled onto the deck.

Once on deck, Mr. Lawrence asked about his cousin and was told that the men were "working on it." Captain Ralls and the deckhands were attempting cardiopulmonary resuscitation on Mr. Matheny. Soon they were able to bring the tugboat to shore. Someone was able to pass a defibrillator to the men on deck and they used it on Mr. Matheny. Eventually TVA's emergency team arrived, and they brought Mr. Matheny to shore on a skiff. Soon thereafter, Mr. Matheny was taken to a local hospital, were he was pronounced dead.

## IV.    The Condition of the Phantom Boat

The court finds that the Phantom boat did not possess any defects at the time of the accident that contributed to its capsize. There was insufficient evidence to show that the boat, a

1981 Phantom fiberglass fishing vessel, was overloaded at the time of the capsize, or that the condition of the boat had any contributory effect on its capsize.

At trial, Mr. Sargent, TVA's expert, testified that the Phantom's maximum load of 900 pounds had been exceeded by 18 pounds on the day in question. This calculation relied on estimates such as 20 pounds of fishing poles and tackle, 16 pounds of life jackets, and 10 pounds of clothing. Mr. Sargent admitted that eight of his weight calculations were estimates, and the court does not find these estimates determinative. Although Mr. Lawrence may have loaded his boat close to the maximum capacity, the evidence does not show that he actually overloaded the boat.

In addition, Mr. Sargent testified that the fishing boat violated several regulations listed in 33 C.F.R. §§ 181 and 183. However, on cross examination, Mr. Sargent was unable to state convincingly what those regulations even required, let alone how the Phantom boat failed to meet them. Mr. Sargent testified that the Phantom did not have sufficient flotation material in the space between the inner and outer hull of the boat and that this had caused this area to be flooded. However, Mr. Sargent did not test for this flotation material. He appears to have reached this conclusion by relying on the testimony of another witness who observed—after the fishing boat had capsized—that its hull was not riding properly in the water. This condition, however, does not in and of itself prove that the flotation material requirement was not met, especially in light of Captain Ralls' testimony that, when he observed the Phantom boat prior to the accident, it was not riding low in the water. Considering the lack of any significant information regarding the flotation material, the court does not find that the Phantom had any such defect.

Although Mr. Lawrence has admitted that, at the present time, the hull of his boat has several cracks, the court does not find the existence of these cracks two years after the accident in question to be very compelling evidence of the condition of the boat at the time of the accident. Considering that the boat suffered a capsize, was subsequently tied against the skimmer wall without any supervision or the use of a bumper, and was then misplaced on a trailer such that the fender of the trailer was digging into the hull of the boat (Plaintiff's Ex. 74M, Defendant's Ex. 20E, 20H), and considering the wear and tear the boat would have suffered in the following two years, the court does not find that the presence of cracks in the hull at the present time establishes that the hull was leaking at the time of the accident. Captain Stoller testified that there was "little reliable evidence to glean" from an inspection performed two years after the accident in question and noted that none of the cracks in the hull identified by Mr. Sargent were visible in the photographs taken in June 2005 or noted by the Tennessee Wildlife Resource Agency ("TWRA") investigators. It is most likely that the cracks were created as a result of the accident and the subsequent handling of the boat, or over the subsequent two years of its use.

Similarly, Mr. Sargent testified that some Phantom boats had been subject to a recall. However, many of the boats identified by Mr. Sargent as having been recalled have very little in common with the boat at issue. For instance, several of the boats were constructed of aluminum, the only similarity with Mr. Lawrence's fishing boat being that they were issued by the same manufacturer. Only 22 of the 1981 Phantom boats were subject to a recall. Moreover, because Mr. Lawrence purchased his boat used, there is no telling whether his boat was actually recalled, repaired by the manufacturer, and returned to the original owner, which is what typically

happens upon a recall.

Mr. Sargent pointed to pictures of the Phantom boat shortly after the accident, in which water appeared to be pouring out of small holes in the upper part of the hull, as evidence of pre-existing damage; however, he subsequently admitted that a working bilge pump also could have accounted for the streams of water evident in these pictures. (*See* Defendant's Ex. 20E) Other photographs indicated tubing that, Mr. Sargent admitted, could be a working bilge pump. (Defendant's Ex. 20H, 20I, 21A) Testimony of other witnesses indicating that the boat did have a working bilge pump and the location of the holes through which the water poured—at the very top of the sides of the boat, which would be floating above water—and the apparent intensity of the water pressure in the photographs lend considerable weight to the finding that the bilge pump was operating in the photographs in question. Other pictures offered at trial appeared to show water coming out of the boat's drain, which is perfectly consistent with a drain plug having been removed from the boat in order to drain the boat, which would be necessary after a capsize. (*See* Defendant's Ex. 23B, 20C, 20D)

Other photographs offered at trial showed that, two years after the accident, parts of the boat's interior had been patched. Mr. Lawrence explained at trial that the speedometer and pitot tube—which were damaged in the accident at issue in this case—had been located in these areas and subsequently removed. Cement was used to seal the areas where these instruments had once been located. Similarly, Mr. Lawrence testified that the bilge pump in his boat was later removed because it never worked after the accident, possibly because it was inadvertently left running for a long period of time after the accident, which was when the photographs, which appear to capture its operation, were taken. (*See*, Plaintiff's Ex. 20D, 20E) Overall, these

photographs are most consistent with a boat being drained and its bilge pump operating to remove water after it was capsized.

Finally, Mr. Lawrence testified at trial that life vests were within reach of himself and Mr. Matheny on the boat and that, when the capsize occurred, he threw one of them to Mr. Matheny. Although Captain Ralls, Mr. Van Zant, and Mr. Welker testified that they did not directly observe any life vests, two working life vests were recovered by the TWRA and appear in photographs taken of the boat on the night in question. Accordingly, the court finds that the life vests were on the boat, in reach of Mr. Lawrence and Mr. Matheny.

## V. Training Received By Captain Ralls and his Crew

The training received by Captain Ralls and his crew and the testimony of David Duke, a primary supervisor at the Cumberland River steam plant[2], regarding the policies of TVA indicate that TVA was aware that a tugboat's excessive speed could cause accidents such as occurred in this case. Captain Ralls has a first class pilot license as well as a tow-operator license and has had safety training in conjunction with obtaining these licenses. In addition, Captain Ralls has earned endorsements to his licenses, allowing him to work on the deck of a boat, to use the radio, and to observe radar. Captain Ralls has been tested on the "Rules of the Road" portion of the Inland Rules of Navigation by the Coast Guard, specifically regarding passing, crossing situations, risk of collision, safety, and good seamanship. He has been trained in collision avoidance and considers the wake of his boat hitting another boat to be a collision. He has

---

[2]Mr. Duke testified that, as coal tower foreman, he is the first-in-command at the Cumberland plant. As such, Mr. Duke supervises the coal hauling foremen, the tugboat operators, coal conveyor dumping operators, deckhands, and laborers, and he is required to sign all personnel evaluations.

worked at several TVA harbors and has no prior citations or investigations regarding his performance.

Captain Ralls testified that he was never told by any supervisors to keep a "no wake" speed in the presence of fishing boats or any other boats, but that he could have done so if he had been so instructed. The defendant did proffer some training course material that was used by TVA in its skills training courses, relating to hand signals, man-overboard training, work hazard training, hazard recognition and control, and boating safety, (Plaintiff's Ex. 34), but Mr. Ralls testified that TVA's training courses had never discussed the specific issue of a vessel capsizing when it crossed an excessive wake of another vessel. Mr. Ralls stated that he did not believe that TVA had ever discussed wake issues in the training sessions.

Mr. Van Zant testified about the man-overboard drills conducted by the crew. In those drills, the tugboat crew is radioed from the tower with a message that there is a man overboard in a particular location of the river. Simultaneously, a dummy is dropped in the river at that location. The crew must then travel to the specified location and retrieve the dummy, using a pike pole. The crew does not practice with the life rings for the practical reason that the dummy cannot reach out and grab them. In addition, Mr. Van Zant testified that he had attended the rivers and deck skills training course and the hazard communication course for deck hands.

David Duke is presently the coal haul foreman at TVA's Cumberland City plant. As such he is ultimately responsible to ensure that the employees of the Cumberland City plant obey safety rules. Mr. Duke testified that TVA has no yearly training program specifically for tugboat operation, but that TVA does require yearly evaluations for the tugboat pilots, which he signs. TVA does not train the pilots in the "Rules of the Road" except through informal "on river"

training.  The rules are not discussed at the rivers and decks training course.  At his deposition,

Mr. Duke testified that he did not believe that the Inland Rules of Navigation—which include the

"Rules of the Road"—apply at all to tugboat operation.  In addition, Mr. Duke testified that no

aspect of the drowning was a safety issue for TVA and, therefore, it was not addressed at any

safety meetings or any other meetings.  At trial, Mr. Duke reversed himself and testified that he

thought that the Inland Rules of Navigation did apply, but he did not know how many there were

or where they were listed.  He thought they included the requirements to keep watch, keep the

boat lit, avoid collision, and to operate at a safe speed.

David Duke testified that there was no specific policy regarding the speed of tugboats,

but that there was an expectation that the tugboats would be operated as slowly as possible

around fishing boats, with as little wake as possible, "according to the circumstances."  He

testified that it is possible to operate the Patricia H. at a no-wake speed.  Moreover, if a tugboat

was 40 to 50 feet away from a fishing boat, which was itself next to a barge, Mr. Duke testified

that the pilot should keep the wake "as little as possible."  Mr. Duke testified that, if he observed

a tugboat operating at an unsafe speed, he would call down about it and would have a duty to

react, but that he had never had occasion to do that.  However, Mr. Duke does not work the night

shift, which is when Jeff Ralls pilots the tugboat and when the accident in this case occurred.

Mr. Duke testified that he had found no records of any prior incidents regarding Captain

Ralls; however, he did not search the pilot logs for evidence of any such incidents.  In the present

case, the only record of Captain Ralls' connection to the accident was in the pilot logs.

Therefore, if Captain Ralls had been in prior accidents, Mr. Duke probably would not have found

evidence of that.  In addition, Mr. Duke testified that Captain Ralls was the most experienced

tugboat captain in the Cumberland City plant.

## CONCLUSIONS OF LAW

I.      **Proportional Liability of the Parties for the Accident**

Under maritime law, "the elements of negligence are generally the same as a common law negligence action, *i.e.*, duty, breach, causation and damages." *Hartley v. St. Paul Fire & Marine Ins. Co.*, 118 Fed. Appx. 914, 919 (6th Cir. 2004) (citing *Pearce v. United States*, 261 F.3d 643, 647-48 (6th Cir. 2001); 1 Thomas J. Schoenbaum, Admiralty & Maritime Law § 5-2 at 183 (4th ed. 2004)).  Additionally, under maritime law, the duty of care can be derived from "duly enacted laws, regulations, and rules; . . . custom . . . or . . . the dictates of reasonableness and prudence." *Galentine v. Estate of Stekervetz*, 273 F. Supp. 2d 538, 544 (D. Del. 2003) (citing *Pennsylvania R. Co. v. The Marie Leonhardt*, 202 F. Supp. 368, 375 (E.D. Pa. 1962); *see also Biscayne Aqua-Center, Inc. v. Hernandez*, 630 So.2d 620, 621-22 (Fl. App. 1993).

The Inland Rules of Navigation, 33 U.S.C. § 2002, supply applicable standards of care for determining negligence in admiralty actions.  The Inland Rules of Navigation supply "rules of the road" that courts have applied in determining the duty of care in admiralty actions.  *See Turecamo Mar., Inc. v. Weeks Dredge No. 516*, 872 F. Supp. 1215, 1229 (S.D. N.Y. 1994) (holding that the Inland Rules of Navigation "encompass long-standing steering and sailing rules and principles, otherwise known as 'Rules of the Road,' which govern navigation on inland water"); *Federal Ins. Co. v. S.S. Royalton*, 312 F.2d 671, 675-6 (6th Cir. 1963) (applying an earlier version of the "rules of the road" in an action for contribution in admiralty).  Both the plaintiff and the defendant have identified several Inland Rules of Navigation, as well as

additional regulations, that apply in determining the standard of care for both parties.

As to the element of causation, the doctrine first enunciated in *The Pennsylvania*, 86 U.S. 125, 136 (1873) applies. Under that doctrine, "when a statutory rule intended to prevent an admiralty accident exists and a party violates that statute injuring a party whom the statute was created to protect, the violating party, to avoid liability, must show that its violation *could not have been* the cause of the accident." *Pearce v. U.S.*, 261 F.3d at 648 (emphasis in original) (citing *The Pennsylvania*, 86 U.S. at 136); *see also Grosse Ile Bridge Co. v. American Steamship Co.*, 302 F.3d 616, 622 (6th Cir. 2002) ("[W]here a vessel at the time of a collision is in violation of a statutory or regulatory rule intended to prevent such a collision, the violation is presumed to be at least a contributory cause of the accident . . . [and] [t]o rebut this presumption, the vessel in violation of a rule must prove not only that the violation was not in fact the cause of the accident, but that the violation *could not* have been a cause of the accident.") (emphasis in original) (internal citations omitted). Accordingly, once it is shown that either party violated one of the applicable rules, the burden shifts to the violator of that rule to show that its violation could not have been the cause of the accident.

In addition, proportional division of liability applies to all admiralty cases. *See, e.g., Phillips Petroleum Co. v. Stokes Oil Co., Inc.*, 863 F.2d 1250, 1255 (6th Cir. 1988) ("Damages in admiralty cases are generally allocated among tortfeasors based on comparative fault."). The Supreme Court has held that, although the damages assignable to the plaintiff's (or, as in this case, the decedent's) own culpability must be subtracted from whatever damages the plaintiff has proven at trial, the defendant would still be liable "in full for the remainder," even where a third party's negligence contributed to the injuries. *See Edmonds v. Compagnie Generale*

*Transatlantique*, 443 U.S. 256, 260 (1979). The plaintiff has identified this state of affairs as an example of joint and several liability, although, as the defendant points out, this label is somewhat inapt: joint and several liability applies "where there has been a judgment against multiple defendants," *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 221 (1994), whereas, in admiralty law, a defendant may be liable for the proportion of fault assignable to another culpable party who was not named as a defendant. *See Edmonds*, 443 U.S. at 273, n.30 ("[The general rule is that a person whose negligence is a substantial factor in the plaintiff's indivisible injury is entirely liable even if other factors concurred in causing the injury," although, "[n]ormally, the chosen tortfeasor may seek contribution from another concurrent tortfeasor.")

Accordingly, the court must first determine whether the defendant's negligence was a substantial cause of the decedent's injury; if so, the court must allocate damages to the plaintiff in the amount of the total loss, minus the damages attributable to the plaintiff's own proportionate fault. Next, the court will determine whether the third-party defendant, Mr. Lawrence, committed any negligent acts that also substantially caused the decedent's injuries and, if so, what proportion of the damages should be allocated to him. Finally, the court must determine liability and proportionate fault as it relates to Mr. and Mrs. Lawrence as counter-plaintiffs.

### A.    Apportionment of Fault

The court finds that Captain Ralls' negligent operation of the Patricia H. was a substantial cause of the decedent's injury. In fact, the court finds that Captain Ralls' creation of an excessive wake was 100% responsible for the capsize of the fishing boat and the death of Mr. Matheny. Accordingly, the court also finds that Mr. Lawrence and Mr. Matheny were each 0%

responsible for the accident.  No set-off will be apportioned against Mr. Lawrence.

**1.    Captain Ralls' Negligent Operation of the Tug**

The following Inland Rules of Navigation have been identified by the plaintiff as having

been violated by the defendant:  Rule 2(b), which provides that "[i]n construing and complying

with these Rules due regard shall be had to all dangers of navigation and collision and to any

special circumstances, including the limitations of the vessels involved, which may make a

departure from these Rules necessary to avoid immediate danger;" Rule 5, which provides that

"[e]very vessel shall at all times maintain a proper look-out by sight and hearing as well as by all

available means appropriate in the prevailing circumstances and conditions so as to make a full

appraisal of the situation and of the risk of collision;" Rule 6, which provides that "[e]very vessel

shall at all times proceed at a safe speed so that she can take proper and effective action to avoid

collision[3] and be stopped within a distance appropriate to the prevailing circumstances and

conditions;" Rule 7(a), which provides that "[e]very vessel shall use all available means

appropriate to the prevailing circumstances and conditions to determine if risk of collision

exists;" and Rule 9(a)(i), which provides that "[a] vessel proceeding along the course of a narrow

---

[3]The plaintiff cites *Bernet Towboat Co. v. USS Chandler*, 666 F. Supp. 1454, 1457 (D.C. Or. 1987), for the proposition that "[t]he term 'collision' is used in its broadest sense so that it applies to a tug striking a ship's wake."  However, the defendant cites *Turner v. Pleasant*, No. Civ. A. 01-3572, 2004 WL 169801 at *4 (E.D. La. Jan. 27, 2004), for the propositions that, with regard to the wake, the defendant owed only "a duty of reasonable care to appreciate the reasonable effect of its wake and to take reasonable precautions to avoid creating unusual swells that may injure others," and that only "'unusual' swells or suction which cannot be reasonably anticipated furnish the basis for a claim."  This authority can be reconciled.  The defendant owed no more than a duty of reasonable care to avoid the creation of an unusual swell or wake; however, violation of any of the Inland Rules of Navigation in conjunction with an unusual swell or wake would create a presumption that this duty was not met.  *See Pearce v. United States*, 261 F.3d 643, 648 (6th Cir. 2001) (discussing the *Pennsylvania* doctrine).

channel or fairway shall keep as near to the outer limit of the channel or fairway which lies on her starboard side as is safe and practicable."  33 U.S.C. §§ 2002, 2005-7, 2009.

In addition, the plaintiff has identified 33 C.F.R. § 164.78 as providing an applicable standard of care that the defendant violated.  33 C.F.R. § 164.78(a)(7), which is one of the Federal Navigation Safety Regulations that have been promulgated by the Coast Guard, provides that "[t]he owner, master, or operator of each vessel towing shall ensure that each person directing and controlling the movement of the vessel . . . [p]roceeds at a safe speed taking into account the weather, visibility, density of traffic, draft of tow, possibility of wake damage, speed and direction of the current, and local speed-limits."  However, as the defendant points out, this language expressly applies only to vessels in the act of towing.  Not only does the regulation refer to "each vessel towing" as opposed to "each towing vessel," but it also mandates that the speed of the vessel must take into account the "draft of tow," which, of course, would not exist were the vessel not engaged in the act of towing.  The defendant's vessel, the Patricia H., was traveling "light boat," or without a barge, and was not towing anything at the time in question.  Therefore, this particular regulation does not apply to the case at hand.[4]

_____

[4]In addition, as the defendant has pointed out, 33 CFR § 164.01 provides that "[t]his part (except as specifically limited by this section) applies to each self-propelled vessel of more than 1600 or more gross tons," and then proceeds to identify §§ 164.70 through 164.82 as applying to "towing vessels of 12 meters (39.4) feet or more in length."  The Patricia H. weighs 95 gross tons and is 52.5 feet long.  Accordingly, 33 CFR § 164.11—identified by the plaintiff in the parties' Joint Proposed Pretrial Order (Docket No. 80)—does not apply.  Similarly, § 164.01(b) provides that if a towboat is "used solely within a limited geographic area, such as a fleeting-area for barges or a commercial facility, and used solely for restricted service, such as making up or breaking tows," then it is exempt from the requirements set forth in § 164.72.  33 CFR § 164.01(b).  Those requirements involve navigational-safety equipment, such as radar, searchlights, VHF-FM radio, magnetic compasses, charts and maps.  § 164.72.  The plaintiff has identified no requirements involving equipment that apply to the Patricia H.

The court finds that Captain Ralls violated Rules 2(b) and 6 of the Inland Rules of Navigation by operating the Patricia H. at an excessive speed when it passed the fishing boat. Rule 2(b) requires that "due regard shall be had to all dangers of navigation and collision and to any special circumstances . . . which may make a departure from these Rules necessary to avoid immediate danger." The facts of this case demonstrate that Captain Ralls simply did not have due regard to the danger that his wake posed to Mr. Lawrence and Mr. Matheny. Although the exact speed of the Patricia H. and exact size of the tugboat's wake cannot be determined, the facts of this case demonstrate that the speed was great enough to create a wake that was large enough to sink a nearby vessel. Far from taking action to avoid an immediate danger, the Patricia H. created an immediate danger to Mr. Lawrence's fishing boat. The Patricia H.'s wake caused another vessel to capsize; therefore, Captain Ralls violated Rule 2(b) by failing to pay due regard to all dangers of navigation and collision to avoid immediate danger.

Rule 6 of the Inland Rules of Navigation provides that each vessel "shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision." The facts of this case demonstrate that Captain Ralls was not operating the Patricia H. at a safe speed, considering that the fishing boat was in a position such that it had to cross the Patricia H.'s wake. Once again, although the precise speed of the Patricia H. at the time in question remains unknown, it is known that the Patricia H. was going fast enough to create a wake that caused another boat to capsize. That is an unsafe speed. In addition, Captain Ralls was demonstrably unable to take proper and effective action to avoid collision, inasmuch as the fishing boat could not escape colliding with the Patricia H.'s wake. By operating the boat at a great enough speed to create a wake that swamped another boat, Captain Ralls violated Rule 6.

Sufficient evidence was not presented at trial to demonstrate that Captain Ralls or TVA violated Rules 5, 7(a), or 9(a)(i) of the Inland Rules of Navigation. Rule 5 requires that each vessel must maintain a proper look-out by sight and hearing, and by all other appropriate means, in order to avoid collisions. Although, at the time of the accident, the deckhands were inside the cabin of the Patricia H., and were not on deck, this, in itself, does not demonstrate a violation of Rule 5. The uncontradicted testimony of Captain Ralls was that, when the Patricia H. was traveling "light boat," it did not require lookouts because Captain Ralls' vision was unobstructed. In fact, the evidence at trial demonstrated that Captain Ralls had no difficulty seeing the fishing boat. He saw it on his first trip to the group of downstream coal barges and, again, on the second trip. The accident occurred, not because Captain Ralls could not see the fishing boat, but because he operated the tugboat at an unsafe speed.

Similarly, there was not sufficient evidence to demonstrate that the defendant did not "use all available means" to determine if a risk of collision existed, as required by Rule 7(a). The issue was not that Captain Ralls or his crew failed to use the appropriate means to determine whether the risk existed, but simply that, given the information that should have alerted them to a risk, they did not take the appropriate action of reducing speed. Or, put more simply, the evidence at trial did not suggest a failure of the information provided to Captain Ralls about his surroundings but, rather, a failure to act appropriately in light of that information. Captain Ralls saw the fishing boat and, accordingly, knew the position of that boat relative to his own. As an experienced tugboat captain, Captain Ralls should have been able to estimate his speed by consulting the mile markers and should have known what size of wake was associated with that speed. Nevertheless, Captain Ralls' wake capsized the boat. It was not a break in the means of

information that caused this accident but merely Captain Ralls' decision to maintain a certain speed.

Finally, there was not sufficient evidence to find that the Patricia H. failed to "keep as near to the outer limit of the channel or fairway which lies on her starboard side as is safe and practicable," as is required by Rule 9(a)(i). Of course, it is not only the size of the wake that caused the accident, but also the position of the boats. If the Patricia H. had been running at top speed several miles away from any other water craft, it would not have been creating an unsafe wake. However, no evidence at trial demonstrated that the Patricia H. could have approached the coal barge in question from a different position in the channel or that it was not as close to the outer limit of the channel as was safe and practicable. Although the proximity of the Patricia H. to the fishing boat was, along with the speed of the boat, a contributing factor to the accident, evidence did not show that it could have achieved its intended position from a different location. Accordingly, the court finds that Captain Ralls violated the speed requirement set forth in Rule 6, but not the "outer limit" requirement of Rule 9(a)(i).

Under the rule announced in *The Pennsylvania*, 86 U.S. at 136, Captain Ralls' violation of Rules 2(a) and 6 are presumed to be "at least a contributory cause of the accident," and the burden shifts to the defendant to rebut this presumption by proving "not only that the violation was not in fact the cause of the accident, but that the violation *could not* have been a cause of the accident." *Grosse Ile Bridge Co. v. American Steamship Co.*, 302 F.3d at 622 (emphasis in original). The defendant has not met this burden. It is undisputed that, at the time of the accident, the water was calm and the weather was mild. Mr. Lawrence's fishing boat was moving very slowly into the channel when Mr. Lawrence first saw the Patricia H. on its second

trip. Mr. Lawrence soon realized that the tugboat's wake would be a problem, so he tried, first, to outrun the wake and, second, to override it. But the fishing boat was swamped by the wake. Captain Ralls' violations of Rules 2(a) and 6, by operating the boat at an excessive speed, caused the size of the wake. Therefore, not only is it the case that the violations *could have* been a cause of the accident, but, in fact, the evidence at trial demonstrated that the violations *did* cause the accident. Accordingly, the defendant has not met his burden under *The Pennsylvania* rule, and the presumption of causation remains in favor of the plaintiff.

### 2.    The "Last Clear Chance" Doctrine

The parties agree that the last clear chance doctrine generally applies to wrongful death actions in admiralty, although the plaintiff argues that it cannot apply in the present case because the decedent was not himself the pilot. This does not answer the question, however, of how exactly the doctrine applies within the proportional division of liability regime in admiralty actions. In such actions, courts have applied the doctrine in conjunction with the requirement of proximate causation; however, they have not applied it to bar liability where proximate cause was not in question. *See Matter of Crounse Corp.*, 956 F. Supp. 1392, 1396 (W.D. Tenn. 1996) ("*Sofec* differentiates between the proximate causality of supervening cause or last clear chance, and the discarded remains of supervening cause or last clear chance in their ameliorative utilities.") (citing *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996)).

In *Sofec*, the Supreme Court adopted Professor Schoenbaum's explanation that "[t]he doctrine of superseding cause is . . . applied where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable." *Sofec*, 517 U.S. at 837 (quoting 1 T.

Schoenbaum, Admiralty and Maritime Law §5-3, p. 165-66 (2d ed. 1994). In this way, "[T]he superseding cause doctrine can be reconciled with comparative negligence" because "it operates to cut off the liability of an admittedly negligent defendant, and there is properly no apportionment of comparative fault where there is an absence of proximate causation." *Id.*

That is, the last clear chance doctrine applies only insomuch as it is defined as a bar to liability when a superseding event has destroyed the proximate causation for the preceding negligent act. It is not enough, under this formulation, for the defendant to point to some negligent act or omission that occurred after the defendant's chief negligent acts. Instead, the defendant must show that the subsequent act or omission was (1) of independent origin and (2) not foreseeable. *See Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*, 447 F.3d 360, 36869 (5th Cir. 2006) (holding that the *Sofec* rule could not preclude liability where "all of the negligent acts occurred within a very small window of time").

The plaintiff does not cite any support for her contention that the last clear chance doctrine cannot apply because the decedent was not himself operating a vessel. In light of the formulation adopted by the Supreme Court—that this doctrine is merely a corollary of the proximate cause requirement—there is no real justification for such a limitation. Under *Sofec*, the last clear chance doctrine remains in force only because it prevents liability where the chain of causation has become overly tenuous. *See In re Kinsman Transit Co.*, 338 F.3d 708, 722 (2d Cir. 1964) (Friendly, J.) ("[T]here must be a terminus somewhere, short of eternity, at which the second party becomes responsible in lieu of the first."). This rationale applies equally whether it is the plaintiff or some other party—or, indeed, a force of nature—that committed the superseding act.

Nevertheless, the last clear chance doctrine does not apply to the case at hand because no act or omission of the decedent or the pilot of the vessel (Mr. Lawrence) or any other person or force that contributed to the decedent's drowning was both (1) independent in origin from the defendant's acts and (2) unforeseeable to the defendant.  The relevant actions committed by Mr. Lawrence in this case—assuming that his fishing boat was in the position that the defendants allege—are that he tied his boat off to a skimmer wall, fished there for a time, then untied it and began to move, slowly, into the channel.  At this point, Mr. Lawrence first encountered the Patricia H.  Surmising that the wake would overwhelm his boat, Mr. Lawrence tried to outrun it, but he could not because there was not sufficient room.  So he turned back to face the wake, which—as he was afraid it might—overwhelmed his boat.  It was not negligent for Mr. Lawrence to fish with his boat tied to the skimmer wall, and it was not negligent for him to decide to move away from the skimmer wall, never having seen the Patricia H. passing by on its first trip.

Even if the court were to find that the actions that Mr. Lawrence took in response to the unsafe wake created by the Patricia H were negligent, they would neither have been (1) independent in origin from Captain Ralls' acts or (2) unforeseeable to Captain Ralls.  Actions taken in direct response to a danger cannot be said to be independent of that danger.  To the contrary, the origin of Mr. Lawrence's actions attempting to avoid and, later, to withstand the wake is found directly in the creation of the wake by Captain Ralls' tugboat.  Similarly, it cannot be said that the actions that Mr. Lawrence took in his attempt to avoid the wake were unforeseeable to Captain Ralls.  If a person creates a hazard to another person, it is quite foreseeable that this hazard will inspire actions taken to avoid it.

Evidence at trial indicated that both outrunning a wake and facing the wake directly to ride over it are common strategies for overcoming such hazards. For instance, Captain Stoller testified that it was proper for Mr. Lawrence to steer into the wake to attempt to ride over it. In addition, James Stanley, an avid fisherman, testified that the only way to withstand a heavy wake, aside from outrunning it, is to face the wake at a perpendicular angle and ride over it. No witness contradicted this testimony. Accordingly, Captain Ralls should have expected that Mr. Lawrence would try either to outrun or ride over the wake that the Patricia H. created.

Finally, because the court finds that Mr. Lawrence's boat was in proper working condition and not overloaded, the boat's condition cannot have been an act or omission that contributed to the accident. However, it is important to note that, even if the boat had been in poor condition or had been overloaded, Captain Ralls would have been able to observe this condition from his position in the tugboat by noting how low the fishing boat was sitting in the water. If, as the defendant alleges, the space between the boat's outer and inner hull had been waterlogged or did not contain the proper amount of flotation material, the Phantom would have been riding low in the water. Captain Ralls, however, testified both that he was able to observe how low the boat was riding *and* that it was not, in fact, riding low in the water. This testimony leads the court to conclude both that the condition of the boat was not defective and that, even if it had been, the condition would not have been unforeseeable to Captain Ralls, since he could observe how the boat was sitting in the water from his tower.[5] Accordingly, the last clear chance doctrine does not act to bar the defendant's liability for Captain Ralls' negligence.

---

[5]Although Captain Ralls did not testify to this, he must also have been able to observe that the two fishermen were not wearing their life jackets—a circumstance that increased the foreseeable danger of the situation.

### 3. The Failed Rescue

The defendant has identified 46 U.S.C. § 2303(a)(1) as providing the applicable standard of care for the claims arising from its alleged failure to adequately rescue the decedent, whereas the plaintiff has identified 46 U.S.C. § 2304.  The first provision, 46 U.S.C. § 2303(a)(1), provides that "[t]he master or individual in charge of a vessel involved in a marine casualty shall . . . render necessary assistance to each individual affected to save that affected individual from danger caused by the marine casualty, so far as the master or individual in charge can do so without serious danger to the master's or individual's vessel or to individuals on board."  The second provision, 46 U.S.C. § 2304, provides:  "[a] master or individual in charge of a vessel shall render assistance to any individual found at sea in danger of being lost, so far as the master or individual in charge can do so without serious danger to the master's or individual's vessel or individuals on board."

It appears that 46 U.S.C. § 2303(a)(1), which refers specifically to a person in charge of "a vessel involved in a maritime casualty" is the more apt provision; however, the issue is somewhat moot, in that each provision appears to create the same standard of care:  the person must render "necessary assistance" to save the individual so far as it can be done "without serious danger" to the vessel or the individuals on board.

The defendant also cites § 2303(c), which provides that "[a]n individual complying with subsection (a) of this section or gratuitously and in good faith rendering assistance at the scene of a marine casualty without objection by an individual assisted, is not liable for damages as a result of rendering assistance or for an act or omission in providing or arranging salvage, towage, medical treatment, or other assistance when the individual acts as an ordinary, reasonable, and

prudent individual would have acted under the circumstances." 46 U.S.C. § 2303(c). The

defendant argues that a Ninth Circuit case interpreting § 2303(c), *Berg v. Chevron U.S.A., Inc.*,

759 F.2d 1425, 1430 (9th Cir. 1985), articulated a standard of care that should be applied in this

case. The court in *Berg* found that a "rescuer will be held liable only (1) for negligent conduct

that worsens the position of the victim or (2) for reckless and wanton conduct in performing the

rescue." *Id*.

However, the *Berg* case involved a rescuer that was not involved in the accident and, for

that reason, is perhaps not the most persuasive authority on the application of § 2303(c) to the

case at hand. Moreover, the clear language of § 2303(c) holds defendants liable when they do

not act "as an ordinary, reasonable, and prudent individual would have acted"—that is, a

negligence standard—and does not include the limitations set forth by the Ninth Circuit in *Berg*.

Especially where the rescuer was involved in the accident that necessitated the rescue, the statute

is more properly read as creating a negligence standard for rescue, provided that the rescue does

not endanger the vessel or crew of the rescuer. *See Hunley v. Ace Maritime Corp.*, 927 F.2d 493,

498 (9th Cir. 1991) ("The duty [of rescue] is all the more imperative where the prospective

rescuer played a part in the original accident itself.") Reading § 2303(c) in conjunction with §

2303(a) leads to the conclusion that, where the rescuer is *not* acting gratuitously, he must (1)

render necessary assistance so long as it does not cause serious danger to the rescuing party, and

(2) not be negligent.

In the case at hand, the defendant's attempted rescue—although it failed to save the life

of Mr. Matheny—met that standard. No piece of evidence presented at trial indicated that

Captain Ralls or his crew hesitated to rescue Mr. Lawrence and Mr. Matheny. Once Captain

Ralls and his crew became aware that an emergency existed, they acted as ordinary, reasonable, and prudent individuals would have acted in attempting to save the two men.  Evidence presented at trial showed that, within four minutes of charting course back to the scene of the capsize, the deckhands were throwing life rings to Mr. Matheny and Mr. Lawrence.  Captain Stoller, the expert witness for the plaintiff, admitted that throwing the life rings was the appropriate thing to do at this time and continued to be appropriate until the boat was close enough to use the pike pole.

Captain Stoller also testified that the deckhands should have switched to using the pike pole at an earlier time than they did.  There was a longer pike pole that could have been used at a greater distance from the two men, but the deckhands did not use it because it was unwieldy.  There is no knowing, however, whether using the longer pike pole would have been successful or not.  The fact remains that—perhaps several  minutes after Captain Stoller testified that they should have—the deckhands did use a medium-sized pike pole to drag Mr. Matheny to the boat.  The deckhands' choice not to use the long pike pole does not amount to negligence.  Instead, the deckhands' choice was based on a reasonable determination that the life rings would be more effective than the long pike pole because it was difficult to maneuver that pike pole.  The fact that they were not ultimately successful in rescuing Mr. Matheny—although it is tragic—does not necessarily show that their decision was incorrect.  The court has no basis to determine whether using the long pike pole would have been more effective.  The deckhands' decision was one that a reasonable person could have made.  Accordingly, the court can find no negligence on that basis.

After pulling Mr. Matheny to the Patricia H. with the pike pole, Captain Ralls and the

two deckhands all cooperated to pull Mr. Matheny into the tugboat. The crew attempted assisted breathing and then cardiopulmonary resuscitation. The chest compressions continued until the men were able to obtain a defibrillator, which was used on Mr. Matheny to no avail. Soon thereafter, Mr. Matheny was taken to shore on a skiff and put into the care of the TVA rescue crew.

The court can find no negligence in the defendant's attempts at resuscitating Mr. Matheny nor in the promptness with which Mr. Matheny was taken to the hospital. Neither the deckhands nor Captain Ralls were, at the time, certified to perform CPR; however, they had been trained in CPR by the TVA, and the defendant has identified no regulation requiring a tugboat captain or his crew to have CPR certification. The evidence at trial indicated that Captain Ralls, Mr. Van Zant, and Mr. Welker acted as fast as they could to get Mr. Matheny on shore and to a hospital and took all available measures to keep him alive while he was on the tugboat. The evidence at trial did not indicate that any other TVA employee was negligent in taking Mr. Matheny to the hospital. To the contrary, the TVA employees appear to have acted as ordinary, reasonable, and prudent individuals would have acted. Accordingly, the court does not find that the defendant was negligent in its attempt to rescue Mr. Matheny and Mr. Lawrence.

### 4.       Set-Off Against Mr. Lawrence

In addition to Rules 2(b), 5 and 6 (which have been set forth above) the defendant has identified the following Inland Rules of Navigation as being applicable to Mr. Lawrence's conduct: Rule 15(b), which provides that "Notwithstanding paragraph (a)[6], on the Great Lakes,

_____

[6]That paragraph provides that, "[w]hen two power-driven vessels are crossing so as to involve risk of collision, the vessel which has the other on her starboard side shall keep out of the way and shall, if the circumstances of the case admit, avoid crossing ahead of the other

Western Rivers, or water specified by the Secretary, a power-driven vessel crossing a river shall keep out of the way of a power-driven vessel ascending or descending the river;" Rule 16, which provides that "[e]very vessel which is directed to keep out of the way of another vessel shall, so far as possible, take early and substantial action to keep well clear;" and Rule 17(a)(i), which provides that, "[w]here one of two vessels is to keep out of the way, the other shall keep her course and speed." 33 U.S.C. §§ 2015-17.

The defendant has also identified a Tennessee Boating pamphlet provided to the public by the Tennessee Wildlife Resources Agency, which identifies "[r]iding on . . . pedestal seats while above an idle speed" as a potential reckless operation of a vessel and requiring that life jackets be kept readily accessible. In addition, the defendant cites a U.S. Coast Guard Regulation providing that life jackets must be "readily available," as well as "[i]n serviceable condition" and "[o]f an appropriate size and fit for the intended wearer." 33 C.F.R. § 175.15.

The court finds that neither Mr. Lawrence nor Mr. Matheny were in violation of any of the above statutes, rules or regulations. Mr. Lawrence took all available actions, under the circumstances, to avoid the accident. No evidence was presented at trial implicating Mr. Lawrence's look-out or his ability to make a full appraisal of the situation and the risk of collision. Mr. Lawrence was operating his fishing boat at a safe speed—Captain Ralls testified that the Phantom was "creeping forward" just before the accident occurred. The evidence at trial indicated that Mr. Lawrence took all available means in keeping out of the way of the tugboat as it descended the river, taking early and substantial action once Mr. Lawrence saw the tugboat. Finally, the evidence at trial indicated that Mr. Matheny was not sitting on a "pedestal seat" but

vessel." 33 U.S.C. § 2015.

instead on a seat that sat flush against the upper deck, with his feet resting on the lower deck, and that two life jackets were both readily available and in serviceable condition. No evidence was presented at trial indicating that either life jacket was not of an appropriate size and fit for the intended wearer.

Further, the court notes that, because the defendant caused a hazard that Mr. Lawrence was forced to act to avoid, the *in extremis* doctrine applies to Mr. Lawrence's subsequent conduct. Under the *in extremis* doctrine, "the decisions of a captain are to be leniently judged when his or her vessel is put in sudden peril through no fault of its own." *Grosse Ile Bridge Co. v. American Steamship Co.*, 302 F.3d 616, 625 (6th Cir. 2002) (citing *Union Oil Co. of California v. The Tug Mary Malloy*, 414 F.2d 669, 673-74 (5th Cir. 1969)). In *The Maggie Smith*, 123 U.S. 349, 355 (1887), the Supreme Court upheld the *in extremis* rule, finding that, "if one vessel is brought into immediate jeopardy by the fault of another, the fact that an order other than that which was given might have been more fortunate will not prevent the recovery of full damages." Instead, "[w]here one ship has, by wrong manoeuvres [sic], placed another ship in a position of extreme danger, that other ship will not be held to blame if she has done something wrong, and has not manoevred [sic] with perfect skill and presence of mind." *Id.* (quoting *The Elizabeth Jones*, 112 U.S. 514, 526 (1884); *see also The Atlantis*, 119 F. 568, 571-72 (6th Cir. 1905); *Slyfield v. Penfold*, 66 F. 362, 366 (6th Cir. 1895).

Mr. Lawrence was put in peril through no fault of his own: Mr. Lawrence was not negligent in first determining to move into the channel because he had not previously seen the Patricia H. passing him. Accordingly, the court will not second-guess Mr. Lawrence's skill in avoiding the wake, or his decision to first try to outrun the wake and then to turn and face it. The

evidence presented at trial indicated that Mr. Lawrence acted according to the standard of a reasonable mariner in a crisis situation.

Finally, at trial, Mr. Sargent identified 33 C.F.R. §§ 181 and 183 as having been violated by Mr. Lawrence relating to the condition of his boat. As discussed above, however, Mr. Sargent was not able to identify any specific provision of those statutes that had been violated, and the court has found none on its own. The photographs taken on the night of the accident are most consistent with a boat, having been capsized, being emptied of excess water by use of a working bilge pump and a removed drain. The fact that the drain was removed in order to remove excess water after the accident does not, in the court's view, demonstrate that the drain was not properly plugged beforehand. Likewise, the appearance of cracks two years after the accident does not prove that the cracks existed at the time the accident took place. The cracks are just as likely the product of the accident itself, the treatment of the boat immediately after the accident, or the wear and tear that occurred over the following two years. The estimates relied upon by Mr. Sargent in testifying that the boat was overloaded were based on a number of generous estimates of the weight of certain items, and the court did not find those estimates to be persuasive. Finally, Captain Ralls testified that, when he viewed the fishing boat, it was not riding low in the water. Accordingly, the court finds that Mr. Lawrence was not negligent by setting off with Mr. Matheny in the Phantom or in any of his other conduct on the night in question.

   **B.     Limitation of Liability**

The limitation of liability statute, 46 U.S.C. § 30505 (formerly § 183), provides that "the liability of the owner of a vessel for any claim, debt, or liability described in subsection (b) shall

not exceed the value of the vessel and pending freight."  Section 30505(b) provides that, in order to be subject to limitation, claims must arise from an act that is undertaken "without the privity or knowledge of the owner."  Further, § 30506(e) provides that, "[i]n a claim for personal injury or death, the privity or knowledge of the master or the owner's superintendent or managing agent, at or before the beginning of each voyage, is imputed to the owner."  Limitation of liability does not apply to the case at hand because TVA had privity or knowledge of the risks posed by Captain Ralls' negligent operation of the Patricia H. at an excessive speed.

Limitation of liability involves two inquiries.  First, the court must identify the negligent acts at issue and, second, determine whether the shipowner had privity or knowledge of those acts.  *See In re Muer*, 146 F.3d 410, 415 (6th Cir. 1998); *In re Cleveland Tankers, Inc.*, 67 F.3d 1200, 1203 (6th Cir. 1995).  With regard to the second inquiry, the "shipowner's privity or knowledge is not measured against every fact or act regarding the accident; rather, privity or knowledge is measured against the specific negligent acts or unseaworthy conditions that actually caused or contributed to the accident."  *Suzuki of Orange Park, Inc. v. Shubert*, 86 F.3d 1060, 1064 (11th Cir. 1996).  Further, in determining privity or knowledge, "the burden of proof shifts to the shipowner trying to limit liability."  *Am. Dredging Co. v. Lambert*, 81 F.3d 127, 129 (11th Cir. 1996); *see also In re Muer*, 146 F.3d at 416 ("The burden of proving negligence lies on the person claiming to be injured, but once negligence is established, the vessel's owner must prove lack of knowledge or privity to the negligence.") (quoting *Cleveland Tankers, Inc. v. Mussa*, 67 F.3d 1200, 1203 (6th Cir. 1995)).

The defendant cannot not meet that burden.  In *Kellogg v. Hicks*, 285 U.S. 502, 510 (1932), the Supreme Court addressed a situation similar to the case at hand, holding sufficient

evidence supported a finding of "privity or knowledge" where a vessel that was "admittedly unfit to run through ice" was, nevertheless, piloted in the Hudson River one afternoon in icy conditions, ultimately resulting in an accident with a floe of ice and the death of over thirty-five passengers. *Id.* In *Kellogg*, it was enough for the relevant decision-makers to know that the vessel should not be piloted in icy conditions to support a finding of "privity or knowledge." *Id.*

Although, as the defendant points out, "navigational errors," in of themselves, are not typically sufficient to defeat limitation of liability, *see, e.g., United States v. Sandra & Dennis Fishing Corp.*, 372 F.2d 189, 198 (1st Cir. 1967), and, "without knowledge . . . that its captain was inadequate or unsafe," the defendant would not be imputed with privity or knowledge of general incompetence, *Kristie Leigh Enter., Inc. v. Am. Commercial Lines*, 72 F.3d 479, 482 (5th Cir. 1996), *Mac Towing Inc. v. American Commercial Lines*, 670 F.2d 543, 548 (5th Cir. 1982), the case at hand does not involve general navigational errors or incompetent captaincy. In fact, the evidence at trial indicated that Captain Ralls had proved himself, up to the time of the accident, to be a perfectly competent captain. Unlike the cases cited by the defendant, the negligent acts alleged in this case were of a more specific nature. In short, Captain Ralls made the tugboat travel too fast for the situation presented. Accordingly, the relative inquiry is whether the defendant had privity or knowledge of the risks posed by tugboats being operated too fast, creating potentially dangerous wakes for nearby fishing boats. The defendant has not shown that it lacked this knowledge.

In fact, David Duke, presently the coal haul foreman at TVA, testified that, due to the danger posed by fast-moving tugboats, the tugboats should be operated as slowly as possible when they are near fishing boats, creating as little wake as possible. In addition, Mr. Duke

testified that, in the situation in which Captain Ralls found himself—where a tugboat was being operated 40 to 50 feet away from a fishing boat, which itself was next to a barge—the pilot should operate at a speed creating as little wake as possible. Nevertheless, Mr. Duke testified that there was no specific policy regarding the speed of tugboats. Further, Captain Ralls testified that he had never been told by any supervisors to keep a "no wake" speed in the presence of fishing boats or any other boats and that, if he had been so instructed, he could and would have done so. None of the training TVA offered its tugboat captains discussed the danger posed by wakes.

This testimony demonstrates that, although TVA was aware of the risk posed by tugboats moving at unsafe speeds in close proximity to small fishing boats, it did not take any steps to reduce that risk. TVA did not even take the minor step of informing its tugboat captains not to operate at a little to no wake speed when in the presence of fishing boats, although, as Mr. Duke testified, such operation is necessary to reduce the risk of capsize. As in *Kellogg*, the defendant was aware that the vessel in question should not be operated in a specific way and yet took no action to prevent it from being operated in that way. Accordingly, the defendant has not demonstrated a lack of privity or knowledge, and limitation of liability does not apply.[7]

_____

[7]The plaintiff also argues that limitation of liability cannot apply because TVA has accepted liability for the negligent actions and omissions of its employees under 16 U.S.C. § 831c-2. That is, according to the plaintiff, when TVA accepted liability under § 831c-2, it forfeited its right to raise defenses that would not have been available to its employees as individuals. This argument is unpersuasive. As the defendant points out, § 831c-2 merely substitutes an action against TVA for an action against "any employee . . . while acting within the scope of his office or employment." 16 U.S.C. § 831c-2(1). That is, TVA only accepts liability for official capacity claims. To the extent that an individual capacity claim against Captain Ralls existed, TVA would not be substituted as the defendant and the claim would not be subject to TVA's defenses. TVA's defenses apply to the present claim—and TVA has been substituted as the defendant—only because the underlying claim was brought against Captain

## C. Discretionary Function

The defendant has also raised the discretionary function doctrine as precluding a number of the plaintiff's allegations. Under the discretionary function doctrine, Congress' waiver of sovereign immunity under the Federal Tort Claims Act does not include "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." *Rosebush v. United States*, 119 F.3d 438, 440 (6th Cir. 1997) (quoting FTCA § 2680(a)). The discretionary function doctrine is a creature of statute, having been written into the FTCA; however, the discretionary function doctrine has also been applied to the Suits in Admiralty Act, *see, e.g., Lawson v. United States*, 124 F.3d 198 (Table), 1997 WL 530540 at * 3 (6th Cir. 1997), and the Sixth Circuit has additionally applied the doctrine in a case, such as this one, arising solely from TVA's acceptance of liability under 16 U.S.C. § 831c-2. *See Edwards v. Tennessee Valley Authority*, 255 F.3d 318, 322-23 (6th Cir. 2001).[8]

_____

Ralls in his official capacity as a tugboat captain. This state of affairs is unremarkable in light of the fact that official capacity suits are traditionally treated as identical to suits against a government entity. *See Myers v. Potter*, 422 F.2d 347, 357 (6th Cir. 2005) ("A suit against an individual in his official capacity is the equivalent of a suit against the government entity.") Moreover, § 831c-2(4) provides that all actions for which TVA has accepted liability "shall proceed in the same manner as any action against the Tennessee Valley Authority *and shall be subject to the limitations and exceptions applicable to those actions*." (emphasis added) Accordingly, it does not appear that § 831c-2 conflicts with the limitation of liability statute but, in fact, made specific allowance for § 30505 and all other statutes that could limit recovery in suits brought against TVA.

[8]In *Edwards*, the court held that, because the TVA is "a 'wholly-owned corporate agency and instrumentality of the United States,'" *id.* (quoting *Hill v. United States Dep't of Labor*, 65 F.3d 1331, 1333 (6th Cir. 1995), TVA is, "in certain limited situations . . . exempt from liability arising out of the exercise of certain wholly governmental functions, where the TVA acts solely as the Government's agent and where the United States itself would not be liable." *Id.* (quoting

Whether or not the discretionary function doctrine applies to a given case is determined according to a two-part test. First, the court must analyze "whether the challenged act or omission violated a mandatory regulation or policy that allowed no judgment or choice." *Id.* (citing *Rosebush*, 119 F.3d 438, 441 (6th Cir.1997) (quoting *Gaubert*, 499 U.S. at 322-23, 111 S.Ct. 1267). If a mandatory policy exists, "then 'the discretionary function exception does not apply because there was no element of judgment or choice in the complained of conduct.'" *Id.* If there exists no mandatory policy, "the court must then determine whether 'the challenged conduct is of the kind that the discretionary function exception was designed to shield.'" *Id.*

In determining whether the conduct at issue involved an element of judgment or choice, the court must first "determine exactly what conduct is at issue." *Rosebush*, 119 F.3d at 441. The majority of the plaintiff's allegations involve the conduct of Captain Ralls himself. That conduct comes under the purview of a corresponding mandatory policy, in the form of the Inland Rules of Navigation and the other regulations discussed above. That is, the claims and allegations arising from Captain Ralls' operation of the Patricia H.—namely, that he was going too fast, and did not adequately take into account potential dangers—do not involve an element of judgment or choice on the part of TVA because they involve violations of mandatory regulations. Accordingly those claims and allegations do not meet the first requirement.

However, the defendant has identified several allegations that do not appear to fall under specific regulations. These allegations are that TVA failed to instruct and train the employees involved in the accident and failed to properly equip the vessel such that the pilot could monitor

_____

*Queen v. TVA*, 689 F.2d 80, 86 (6th Cir. 1982)).

engine RPM and speed.  Although these acts and omissions do not specifically fall under any of the regulations identified by the plaintiff, they do bear a strong, albeit secondary, relation to those regulations.  That is, there are specific regulations mandating that vessels maintain an appropriate speed, that pilots take due regard for possible collisions, that crew maintain a proper look-out, and that reasonable steps be taken to rescue individuals in the event that they are thrown into the water following an accident.  The allegations involving the failure to train, equip, and maintain appropriate policies all relate to these regulations: the training, equipment, and policies—if they were found to be adequate—would all be in furtherance of compliance.  Therefore, this case does not present the situation where the plaintiff's claims evoke discretionary failures wholly unrelated to statutory regulations.

Nonetheless, the allegations regarding TVA policies do not implicate any specific regulations themselves.  The plaintiff has identified no applicable state or federal regulation mandating a certain amount of training or equipment, or a specific speed limit that TVA must adhere to.  Under *Rosebush*, there exists an element of judgment or choice with regard to how TVA trains and equips its employees, and as to what its specific policy regarding the speed of tugboats should be.

However, although TVA passes the first part of the analysis with regard to those allegations, it does not pass the second.  In *Edwards*, the court identified the following types of decisions that do pass the second part of the analysis:  "(1) 'the proper response to hazards,' (2) 'whether and how to make federal lands safe for visitors' and (3) 'whether to warn of potential danger.'" *Id*. (quoting *Rosebush*, 119 F.3d at 441).  Two of those three categories are clearly inapt; the plaintiff's claims do not concern "whether and how to make federal lands safe" or

"whether to warn of potential danger," but, rather, they relate to specific actions committed by agents of the defendant.  The failure to train, equip, and provide policies for those agents likewise does not relate to keeping land safe or failure to warn but, rather, those specific actions.

For similar reasons, the first category also does not apply.  This case does not merely involve the response to a hazard but, instead, the creation of a hazard.  It would be an odd outcome if, although the court found that specific regulations did cover the underlying conduct, the court were to find that the discretionary function doctrine was "designed to shield" policy failures that directly lead to that prohibited conduct.  If the second requirement is to have any effect at all, it would have to protect liability for some actions that are not specifically prohibited by statute; policy failures that directly bring about prohibited conduct would seem to be first on that list.  *C.f. Sutton v. Earles*, 26 F.3d 903, 910 (9th Cir. 1994) (holding that the failure to properly notify the public of proper speed limits in navigable waters did not fall under the discretionary function doctrine). Finally, the court notes that, because liability is additionally predicated on Captain Ralls' direct violations of the Inland Rules of Navigation, even if the court were to apply the discretionary function doctrine to bar the plaintiff's claim for negligent supervision and entrustment, it would not preclude the defendant's liability for Captain Ralls' negligence under 16 U.S.C. § 831c-2.  The court finds that the discretionary function doctrine does not bar any of the plaintiff's claims or allegations.

### E.    Negligent Supervision and Negligent Entrustment

As a separate basis for liability, the court also finds that TVA negligently supervised Captain Ralls by failing to specifically instruct him to maintain a low speed or a low wake in the presence of small fishing vessels.  Under Tennessee law, TVA owed a duty of care to the

plaintiff (and to the counter-plaintiff, Mr. Lawrence), regarding the negligent acts of Captain Ralls performed while he was on duty. *See Lett v. Collis Foods, Inc.*, 60 S.W.3d 95, 99-100 (Tenn. App. 2001) (noting that although it was not clear that Tennessee had adopted the entirety of the Restatement (Second) of Torts § 317, it did follow the special relationship test outlined in Restatement (Second) of Torts § 315-19). TVA's duty of care was that of a reasonable employer under the circumstances. A risk is "unreasonable and gives rise to a duty to act with due care if the foreseeable probability and gravity of harm posed by defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented the harm." *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995). This determination is to be made in accordance with the following factors:

> [T]he foreseeable probability of the harm or injury occurring; the possible magnitude of the potential harm or injury; the importance or social value of the activity engaged in by defendant; the usefulness of the conduct to defendant; the feasibility of alternative, safer conduct and the relative costs and burdens associated with that conduct; the relative usefulness of the safer conduct; and the relative safety of alternative conduct. . . . Stated succinctly, a duty of reasonable care exists if defendant's conduct poses an unreasonable and foreseeable risk of harm to persons or property.

*Id.* (citing Restatement (Second) of Torts, §§ 292, 293 (1964)).

The defendant violated this standard of care when it failed to instruct its tugboat captains about the dangers of operating tugboats so as to create wakes when fishing boats were present or, indeed, to implement any policy with regard to speed or wake relative to small boats. The court does not find that the defendant violated its standard of care with regard to its man-overboard drills or its general training course work. That is, in light of the relative usefulness, feasability, and costs associated with the training programs, the evidence at trial did not indicate that the defendant was legally obligated to include more courses or to change its man-overboard drill.

47

However, the defendant could have taken one very simple step, posing little to no cost, and greatly reducing the probability of harm such as occurred in this case, which was to simply inform its tugboat captains that they were not to operate tugboats at a speed that created an excessive wake when fishing boats were present.

TVA allowed fishing boats to freely use this area of the river, maneuvering between and around the numerous coal barges that were deposited, moored and moved to and from the nearby unloader.  Yet, Captain Ralls testified that he had "never discussed wake" during TVA's training courses, and that he had never been told to operate the tugboat at a little-to-no-wake speed in the proximity of fishing boats.  David Duke testified that there was no specific policy regarding tugboat speed, even though he recognized the danger to smaller boats of the wake created by a fast-moving tugboat.  Yet TVA never told Captain Ralls to operate the tugboat with little to no wake when fishing boats were near.

Such an instruction probably would have averted the disaster that occurred in this case. The fishing boat was capsized because Captain Ralls was operating the Patricia H. at a high enough speed to create an excessive wake.  However, Captain Ralls testified that, if he had been told by any supervisors to keep a "no wake" speed in the presence of fishing boats, he could and would have done so.  Accordingly, the court finds that both the causation and damages requirements for negligence have been met and that TVA is liable for negligent supervision.

The defendant did not, however, commit negligent entrustment.  Negligent entrustment requires a showing that "a chattel was entrusted to one incompetent to use it with knowledge of the incompetence, and that its use was the proximate cause of injury or damage to another." *Watrous v. Johnson*, No. W2007-00814-COA-RX-CV, 2007 WL 4146289 (Tenn. App. Nov. 21,

2007) (quoting *West v. East Tenn. Pioneer Oil Co. d/b/a Exxon Convenience Store*, 172 S.W.3d 545, 554 (Tenn. 2005)); *see also* Restatement (Second) of Torts § 390 (1965). The court does not find that Captain Ralls was incompetent to pilot the Patricia H. In fact, at the time of the accident, Captain Ralls appears to have been the most qualified tugboat captain that TVA employed. Although the court finds that Captain Ralls was negligent in this specific instance, it finds no basis to question his overall competency as a tugboat captain. Accordingly, TVA did not commit negligent entrustment.

F.       **The Separate Claim for Loss of Consortium**

The plaintiff has brought a separate claim for loss of consortium which, the defendant alleges, cannot provide recovery because such claims are not allowed in admiralty personal injury actions. The defendant admits that *damages* for loss of consortium are available in a maritime action occurring in Tennessee, through application of the Tennessee Wrongful Death Statute, but distinguishes between the application of state law *remedies* and state law *claims* under admiralty law.

There is no basis for this distinction. In *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 202 (1996), the Supreme Court held that "state remedies remain applicable" in maritime actions "and have not been replaced by the federal maritime wrongful death action" recognized in prior Supreme Court decisions. In support of its decision, the Supreme Court reasoned that, although prior decisions had eliminated the states' ability to reduce liability under the federal scheme, it remained possible that a state's remedial scheme could provide a more generous liability or damages regime than federal law. *Id*. at 214-215. Although *Yamaha* dealt solely with the issue of a state damages statute, and not a separate state cause of action for loss of

consortium, the opinion does not appear to rely on a distinction between those two concepts.  In fact, the Court stated that, "we preserve the application of *state statutes* to deaths within territorial waters,"  *Id*. at 216 (emphasis added), which leaves open the possibility of both purely remedial state law and state law which creates causes of action.

In support of its distinction between damages statutes and causes of action, the defendant relies on *Lollie v. Brown Marine Serv., Inc.*, 995 F.2d 1565, 1565 (11th Cir. 1993), in which the Eleventh Circuit held that "neither the Jones Act nor general maritime law authorizes recovery for loss of society or consortium in personal injury cases."  However, *Lollie v. Brown Marine Serv., Inc.*, a one page opinion which was issued three years prior to the Supreme Court's *Yamaha* decision, appears to apply not only to causes of action for loss of consortium, but to all "recovery" of such damages and, accordingly, may not survive the Supreme Court's contrary decision in *Yamaha* in full.  In fact, in a more recent Eleventh Circuit decision, *Tucker v. Fearn*, 333 F.3d 1216, 1224-25 (11th Cir. 2003), the court noted that, although federal maritime law did not create an avenue for damages for loss of consortium, under *Yamaha*, state law could provide for such a remedy.  In *Tucker*, a loss of consortium claim was impermissible only because the state at issue—Alabama—did not allow for loss of consortium damages in its Wrongful Death Statute.  Where the state at issue does allow for loss of consortium damages, the Eleventh Circuit has held that such damages are cognizable when brought in connection with maritime causes of action.  *See American Dredging Co. v. Lambert*, 81 F.3d 127, 130-31 (11th Cir. 1996) ("Because . . . no federal statute or common law precedent precludes the personal representatives from recovering non-pecuniary damages under Florida law, we affirm the denial of partial summary judgment on the issue of the recoverability of non-pecuniary damages.").

Since *Yamaha*, several federal courts have held that, concomitant to maritime personal injury and wrongful death actions, state law claims for loss of consortium are valid. *See, e.g., Hester v. Cottrell Contracting, Corp.*, No. 7:00-CV-70-BR(1), 2001 WL 1764200 at * (E.D. N.C. 2001) ("Hester's claim for loss of society and consortium, which is cognizable under North Carolina Law . . . may proceed."); *In re Clearsky Shipping Corp.*, No. Civ. 96-4099, 2002 WL 31496659 at *5 (E.D. La. 2002) (holding that because, under Louisiana law, the plaintiff could "maintain a claim for loss of consortium damages," such a claim could survive in connection to a maritime personal injury action); *Naglieri v. Bay*, 977 F. Supp. 131, 136 (D. Conn. 1997) (holding that, following the *Yamaha* decision, the plaintiffs would be permitted to add a claim to their complaint for loss of consortium). Accordingly, under *Yamaha*, the plaintiff is permitted to request damages for loss of consortium in a separate claim. *See, e.g., Correll v. E.I. DuPont de Nemours & Co.*, 207 S.W.3d 751, 754-56 (Tenn. 2006) (analyzing subrogation issues arising from a separate claim for loss of consortium). The court will analyze the extent of the loss of consortium damages below.

### G.    Mr. and Mrs. Lawrence's Claims Against TVA

Mr. and Mrs. Lawrence have filed counterclaims against TVA for negligence, negligent supervision and entrustment, and loss of consortium. In short, these counterclaims against TVA are identical to the claims filed by plaintiff Becky Matheny on behalf of her husband. For the same reasons expressed above, the court finds that Captain Ralls' negligence was 100% responsible for the injuries suffered by Mr. Lawrence when his boat capsized, that Mr. Lawrence was 0% responsible for the accident, and that limitation of liability and the discretionary function doctrine do not limit TVA's liability for Captain Ralls' negligence. In addition, TVA is liable for

negligent supervision because it did not inform its captains to observe a low wake speed in the presence of fishing boats.

## III.    Damages

The parties agree that Tennessee law supplies the rule for what damages can be recovered here.  Tennessee's Wrongful Death Statute provides the plaintiff with a "right to recover for the mental and physical suffering, loss of time, and necessary expenses resulting to the deceased from the . . . injuries, and also the damages resulting to the parties whose use and benefit the right of action survives from the death consequent upon the injuries received."  Tenn. Code Ann. § 20-5-113 (1994 & Supp. 2006).  Specifically, these damages include conscious pain and suffering, *Patterson v. Dunn Crowley, Inc.*, No. 02A01-9710-CV-00256, 1999 WL 398083 (Tenn. Ct. App. 1999), lost earning capacity, *Interstate Life & Accident Co. v. Cox*, 396 S.W.2d 80 (Tenn. 1965), and loss of consortium, *Jordan v. Baptist Three Rivers Hosp.*, 984 S.W.2d at 600.

### A.    Damages Owed to the Plaintiff

The plaintiff is entitled to $2,159,153.00 in compensatory damages, as detailed below.

#### 1.    Conscious Pain and Suffering

The evidence at trial indicated that Mr. Matheny died from drowning.  Approximately ten minutes after Mr. Matheny fell into the water, he lost consciousness.  Over those ten minutes, Mr. Matheny undoubtedly experienced excruciating pain and terror as he struggled to stay afloat and to breathe.  The court cannot overstate the difficulty of calculating the pain and suffering associated with drowning in a monetary sum, but awards $75,000 for conscious pain and suffering.

### 2.     Lost Earning Capacity

At the time of his death, Mr. Matheny was 49 years old.  Although previously employed by the Tennessee Department of Corrections, Mr. Matheny was not employed at the time of his death, but was instead acting as primary caretaker for his granddaughter.  His last job had been at a car rental service, where he delivered rental cars to customers and drove them back and forth between locations, earning $350 per week.  At the time of his death Mr. Matheny was drawing a disability pension from the Tennessee Department of Corrections and had applied for disability benefits from the Social Security Administration.

Mr. Matheny had been out of work in part so that he could serve as primary caretaker to his granddaughter, but also because he suffered from coronary artery atherosclerosis.  On September 27, 2004, after a long history of heart problems, Mr. Matheny suffered a heart attack, and he did not work after that point, although Mrs. Matheny testified that he had planned to go back to work.  The plaintiff has submitted the opinion of Dr. Jordan Asher, MD, a physician with St. Thomas Hospital, who believes that Mr. Matheny's life expectancy should not be "reduced at all due to his small vascular disease" and that, because his carotid artery had been "fixed," his life expectancy should decrease "at only 2% to 5%." (Docket No. 85, Ex. 1)

The defendant submitted an expert statement from Dr. James E. Davia, an associate professor of medicine in the division of cardiology from the Medical College of Virginia, who stated that, due to Mr. Matheny's "twenty-nine hospital admissions between 1995 and early 2005, plus one referenced hospitalization in 1991," Mr. Matheny had "a very poor prognosis for survival and would have died as a result of a heart attack or stroke within two or three years and definitely within five years." (Docket No. 75, Ex. A at p.2)  Dr. Davia bases his opinion on

medical records and on the autopsy report, which revealed "a significant narrowing in the main left coronary artery which is the worst possible location in the coronary circulation to have an obstruction because of its prognosis for death." (*Id.* at p. 3)

The court finds Dr. Davia's more extensive statement to be persuasive. It is beyond dispute that Mr. Matheny suffered from serious heart disease, requiring multiple hospitalizations, and the court finds that his life expectancy should be modified accordingly.

In addition, the defendant has submitted expert testimony from Dr. Parker Cashdollar, an economic consultant, who has performed calculations regarding the present value of Mr. Matheny's pension and household services, minus the "reasonable necessary expenditures"[9] of the deceased. (Docket No. 92, Ex. 2 at p. 2). According to Dr. Cashdollar's tables, the present value of Mr. Matheny's Tennessee disability pension, minus his maintenance expenditures, assuming a life-expectancy of five years, is $29,402. (Defendant's Ex. 46) The present value of Mr. Matheny's household services for five years is $54,751. (Defendant's Ex. 47) No proof was submitted as to what Mr. Matheny's social security disability benefits would have been, or demonstrating that Mr. Matheny would have qualified for social security benefits. Accordingly, damages in the amount of $84,153 will be awarded for lost earning capacity.

### 3. Loss of Consortium

Finally, the court addresses damages for loss of consortium. As discussed above, damages for loss of consortium "are not limited to spousal claims but also necessarily encompass

---

[9]Under Tennessee law, damages for lost earning capacity "is not to be measured by the decedent's gross earnings, but by his net earnings, which consist of gross earnings minus personal maintenance expenses." *Wallace v. Couch*, 642 S.W.2d 141, 143 (Tenn. 1982) (quoting 76 A.L.R. 3d 125 (1977)).

a child's loss, whether minor or adult." *Jordan*, 984 S.W.2d at 600. The Tennessee Supreme Court has explained that:

> Loss of consortium consists of several elements, encompassing not only tangible services provided by a family member, but also intangible benefits each family member receives from the continued existence of other family members. Such benefits include attention, guidance, care, protection, training, companionship, cooperation, affection, love, and in the case of a spouse, sexual relations. . . . Although "[a]dult children may be too attenuated from their parents in some cases to proffer sufficient evidence of consortium losses," the "age of the child does not, in and of itself, preclude consideration of parental consortium damages."

*Hunter v. Ura*, 163 S.W.3d 686, 705 (Tenn. 2005) (quoting *Jordan*, 984 S.W.2d at 601); *see also Davidson v. Lindsey*, 104 S.W.3d 483, 493 (Tenn. 2003).[10]

Mr. Matheny is survived not only by a wife, but also by two adult daughters and one adult son. As difficult as it is to quantify the pain and suffering caused by drowning, it is perhaps even more difficult to quantify the loss of a husband or father. But the court must do so. The evidence presented at trial indicated that Mr. Matheny had a very close relationship with his children and with his wife. Mr. Matheny's wife and each of his three children will be awarded $500,000 for loss of consortium, for a total of $2,000,000.

### B. Damages Owed to Mr. And Mrs. Lawrence

Mr. and Mrs. Lawrence, as counter-plaintiffs, are entitled to recover $238,685.10 in compensatory damages, as detailed below.

---

[10]Although Mr. Matheny's adult children were not named as plaintiffs, the Tennessee courts have consistently allowed for such damages when a wife has brought a wrongful death action on behalf of herself and the estate of her spouse. *See, e.g., Hunter*,163 S.W.3d at 705; *Jordan*, 984 S.W.2d at 601. Therefore, since Mrs. Matheny has brought this action on behalf of both herself and the deceased, Mr. Matheny, such damages may be recovered. *See Davidson v. Lindsey*, 104 S.W.3d 483, 493 (Tenn. 2003) (holding that evidence supported an award of loss of consortium damages to an adult child and that a limiting instruction to the jury regarding such damages was not necessary).

### 1. Personal Injury Damages

Mr. Lawrence spent the night of the accident at Vanderbilt University Hospital. He has not suffered any ongoing physical injuries. However, Mr. Lawrence has submitted his costs for his overnight stay, and the tests that were conducted on him during that stay. The parties have stipulated to Mr. Lawrence's medical expenses as totaling $13,585.10 (Exhibit CP-70), and he shall be awarded those expenses as damages.

In addition, Mr. Lawrence is entitled to damages for the mental anguish he suffered as a result of this accident. Mr. Lawrence spent a period of time in the Cumberland River during which his own safety was very much at issue and, in addition, he bore witness to the drowning of Mr. Matheny, his cousin and close friend. The testimony of Mr. Lawrence, his friends and family clearly establishes that he continues to suffer serious psychological damage from this accident that will continue to some indefinable point in the future. Mr. Lawrence shall be awarded damages in the amount of $150,000 for mental anguish.

### 2. Loss of Consortium

In addition, Mr. and Mrs. Lawrence have requested damages for loss of consortium. Loss of consortium is available in Tennessee for both personal injury and wrongful death causes of action. *See, e.g., Clark v. Shoaf*, 209 S.W.3d 59, 61 (Tenn. App. 2006). Evidence presented at trial indicated that, although Mr. Lawrence has suffered no ongoing physical disability, he has been very much a different person following this accident. Witnesses testified that Mrs. Lawrence has become, in many way, more a caretaker than a wife, that Mr. Lawrence has become distant and that he is often fixated on the night of the accident. In his current state, Mr. Lawrence's ability to care for and relate to his wife has suffered a diminution. The court awards

$75,000 for loss of consortium.

### 3. Damage to the Phantom Boat

Mr. Lawrence did not submit evidence quantifying the damage to the Phantom boat that resulted from its capsize. However, evidence at trial indicated that there was damage to the bilge pump and other devices, that the seat on which Mr. Matheny had been sitting was lost in the accident, and that the hull was scratched afterwards. The court will award $100 for this damage.


### CONCLUSION

Judgment is entered for the plaintiff in the amount of $2,159,153.00 for compensatory damages, and in favor of the counter-plaintiffs in the amount of $238,685.10 for compensatory damages.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge